Filed 7/15/13  P. v. Moreno CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>SAMUEL MORENO,<br><br>    Defendant and Appellant. | B241046<br><br>(Los Angeles County<br>Super. Ct. No. BA 385729) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kathleen A. Kennedy, Judge.  Affirmed with directions.

Kevin D. Sheehy, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Zee Rodriguez and Connie H. Kan, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \*

Appellant Samuel Moreno challenges his conviction and sentence for willful, deliberate, and premeditated attempted murder and attempted second degree robbery with enhancements on two grounds: (1) the trial court improperly excluded evidence that the victim, who was the only eyewitness to the incident, had a prior felony conviction for sale of cocaine and had previously given false names to police; and (2) the trial court improperly refused to give a "pinpoint" jury instruction regarding law enforcement's improper influence on the victim during a photo identification procedure. Appellant also contends that the trial court's sentencing minute order incorrectly reflects his sentence on count 2 as orally pronounced by the court. On this point, the attorney general agrees.

We affirm appellant's conviction. We direct the trial court to correct the sentencing minute order to reflect the court's oral pronouncement of appellant's sentence.

## PROCEDURAL BACKGROUND

On June 15, 2011, appellant was charged with two counts of attempted willful, deliberate, and premeditated murder and attempted second degree robbery, along with several enhancement allegations for gang association, firearm use, and infliction of great bodily injury. After the trial court struck one firearm allegation under Penal Code section 12022.5, subdivision (a)[1] during trial, the jury found appellant guilty of all charges and found all allegations true. Appellant was sentenced to a total of 77 years to life in prison as follows: 15 years to life for count 1, plus 25 years to life for the firearm enhancement; and two years for count 2, plus 10 years for the gang enhancement and 25 years to life for the firearm enhancement. Appellant timely appealed.

## STATEMENT OF FACTS

### 1. Prosecution Case

Around 7:30 or 8:00 p.m. on September 1, 2009, Oscar Paniagua, a taxicab driver, picked up appellant and another passenger at 8th Street and New Hampshire Avenue in Los Angeles. Appellant sat in the back seat and the other individual sat in front next to Paniagua. Appellant initially told Paniagua to drive to the intersection of Clinton Street and

---

[1] Undesignated statutory citations are to the Penal Code.

Ardmore Avenue, but he changed his mind and told Paniagua to take them to Clinton Street and Hobart Boulevard. When Paniagua stopped there, one of the passengers asked how much the fare cost and Paniagua told him $8. At that time, Paniagua took off his seatbelt because it was "really dark" and "pretty desolate," and he felt "unsure" about the passengers because he saw "they were kind of nervous."

Appellant gave Paniagua a $10 bill and Paniagua pulled out money to make change. As the front passenger exited the taxi, Paniagua turned around and saw appellant remove a revolver from a computer bag; he said to Paniagua, "Give it to me." Paniagua "just went for" the gun to try to take it away from appellant. During the minute-long struggle that ensued, Paniagua said, "Let go of it; give it to me," and appellant responded two or three times that "he couldn't give [Paniagua] the gun" and yelled to the other passenger outside the taxi to "[k]nife" and "[b]ite" Paniagua. Appellant bit Paniagua's arms and the other passenger bit Paniagua's hand, and Paniagua bit appellant on the left side of his back. Paniagua was able to see appellant's face in the interior dome light of the taxi during the struggle.

As Paniagua struggled with appellant, the passenger outside the taxi kicked him in the face several times, causing him to become dizzy. At that point, Paniagua decided to leave the scene; as he drove away, he heard two or three shots and felt something "hot" on the back of his shoulder. He drove about four blocks and sought help, clipping another car on the way, and eventually stopping at Kingsley and Rosewood Drives. Following an emergency call, Los Angeles Police Department (LAPD) Officer Luis Interiano and his partner found Paniagua with blood on his mouth and back, a contusion on his face, a "completely bloodshot red" eye, bite marks on his arms, and a gunshot wound in his back.

At the hospital approximately 45 minutes to an hour after the incident, Paniagua described the shooter to Officer Interiano and LAPD Detective James Bland as a "male Hispanic," about five feet six or seven inches tall, "a bit chubby" at about 150 to 170 pounds; he also said the shooter had short hair, facial acne, a scar on his lip, and a baseball cap, although Detective Bland testified that Paniagua did not say appellant wore a hat. However, when he was booked a month later, appellant weighed 140 pounds, was five feet

3

two inches tall, and had an "oval shape" on the left side of his back that looked like a bite mark.

Shortly after Paniagua was taken to the hospital, another LAPD officer searched his taxi. The officer found $14 in cash, a bluetooth headset, a hat, and a brown shirt, as well as a camcorder and a disk for the camcorder on the floor of the backseat, which did not belong to Paniagua. There were also bullet holes in the driver's headrest and the passenger-side dashboard; a detective later recovered the bullet in the dashboard. At the intersection of Harvard Boulevard and Clinton Street, the officer recovered collision debris and a blue Rams hat.

LAPD Officer Shane Bua watched the video from the camcorder several times, which showed eight individuals -- including appellant -- rapping in Spanish and drinking beer. Officer Bua was able to identify the location of an outdoor scene in the video, and on September 19, 2009, he and his partner visited that area. They encountered two intoxicated individuals: appellant and an individual named "Raton" and known to be a Mara Salvatrucha gang member. They completed field identification cards for both individuals, took appellant's photograph, and drove appellant home a few blocks away on North Kingsley Drive.

Detective Bland included appellant's photograph in a six-pack photographic lineup (six-pack photo lineup) that he showed to Paniagua. Before Paniagua examined the photos, Detective Bland admonished him in writing that, among other points, the six-pack photo lineup may or may not contain a picture of the person who committed the crime being investigated, and Paniagua indicated that he understood. Paniagua identified appellant as the shooter and wrote the statement: "Number four resembles him more. His weight, his eyes, his ears, his mouth, his face. He is the one who shot me. He had the gun, and he was sitting in the back seat." Detective Bland then showed him parts of the video that had been recovered from his taxi. He had Paniagua "look at individuals" and "asked him, anybody else involved, or is there anyone here involved in this video?" Paniagua again identified appellant as the "same one who had shot me." Detective Bland later created two other six-pack photo lineups excluding appellant but including two individuals whose fingerprints

4

were found inside Paniagua's vehicle after the shooting; Paniagua did not recognize any of those individuals.

No fingerprints were lifted from the camcorder. DNA samples were taken from the camcorder and the Rams hat, but appellant was excluded as a donor. Eighteen latent fingerprints were found on the interior and exterior of Paniagua's taxi and three individuals were verified as matches; none matched appellant or the name "Oscar Paniagua." Two of the three individuals were included in the two subsequent six-pack photo lineups shown to Paniagua. The third individual was determined to be Paniagua, although his fingerprints were associated with the names "Carlos Solis," "Golon Golon," "Carlos Angel Solis," and "Sergio Antonio Lopez." Detective Bland determined Paniagua was, in fact, Sergio Antonio Lopez. At trial, Paniagua admitted on cross-examination that he did not have a driver's license on the night of the incident.

Detective Bland obtained a warrant and searched appellant's residence. Officers seized two cell phones from under appellant's bed in the living area; one contained a picture with the word "Salvatrucha," and the other contained photos of appellant and several photos of a "blue steel or darkened-color revolver with wooden grips" or "revolver-type handgun." Officers also seized eight photographs of appellant and others "manipulating their hands."

On October 8, 2009, Detective Bland and LAPD Detective Humberto Tovar arrested appellant at the construction site where he worked. Detective Bland recovered a cell phone from him and found a text message on it in Spanish to "Droopy" stating: "It's real hot with the cops last night. They stopped me again. Later. Take care of yourself." The detectives did not, however, investigate when the message was sent, who "Droopy" was, or who was the subscriber of the phone number connected to the cell phone.

At trial, Paniagua was asked if he saw in the courtroom one of the individuals he picked up in the taxi that night, and he testified, "I think so" and "I think I did" see him in the courtroom. He was then asked, "As you look at the defendant here in court today, are you certain or not that that is the person who you picked up?"; he replied, "Yes, it is the same person." He also testified on direct examination that, at the preliminary hearing in 2009, he had been shown a photograph of someone other than appellant (marked at trial as

5

People's Exhibit 3), and he had been asked if the person in the photo looked like appellant. He responded that "it looked like [appellant] but it wasn't him." He testified that he was "certain that the person who actually shot [him] is the person who is in court today."

Later at trial Exhibit 3 was identified as depicting appellant's cousin Alejandro Rivas. Detective Tovar, who arrested appellant with Detective Bland, had heard the name "Alex Rivas," but he was never assigned to locate him. Nor were any checks for latent fingerprints run against records for "Alejandro Rivas" or "Amilcar Alejandro Rivas."

The People called two expert witnesses at trial, including forensic dentist Gregory Golden.[2] Dr. Golden examined the bite mark on Paniagua's arm. He explained that there are four levels of certainty as to whether a bite mark matches someone as the biter: (1) a reasonable medical certainty that the person is a biter; (2) the person is the probable biter; (3) the person cannot be ruled out as the biter; and (4) there is insufficient evidence to determine whether the person is the biter. Comparing a life-sized photograph of Paniagua's bite mark to an overlay of appellant's teeth,[3] Dr. Golden found similarities, so he placed appellant in category three; that is, he could not exclude appellant as the biter, but he could not say that appellant was either a certain or probable biter.

## 2. Defense Case

Appellant did not testify but he called several witnesses in his defense. Appellant's sister Nelly Moreno and her husband Alfredo Badio, whom appellant lived with, testified that they each returned home from work around 6:00 or 6:30 p.m. on September 1, 2009, to find appellant already home, lying down and wearing his work clothes and shoes;[4] he never left the apartment for the rest of the night. After the three of them prepared and ate dinner,

---

[2] The other expert was gang enforcement Police Officer Robert Chiu, who ultimately testified that the shooting and attempted robbery were for the benefit of the gang. Appellant has not challenged the gang allegations, so we need not set forth the details of his testimony.

[3] Dr. Golden scaled the photograph of Paniagua's bite mark using a piece of tubing appearing in the photograph as a reference point for the life-size dimensions depicted.

[4] Moreno testified that he was wearing "tennies," while Badio testified that he was wearing "boots" and "not tennis shoes."

6

they heard an ambulance outside around 8:00 or 8:30 p.m. They went onto the balcony of their apartment and saw Paniagua was injured and was being taken out of his taxi. Both Moreno and Badio testified that their nextdoor neighbors also came out, and that they spoke with the "lady from next door," Linda Sierra, and her husband. But Sierra testified that when she came out onto her balcony, she was alone and did not see or talk to anyone on Moreno and Badio's balcony while she was out there.

Moreno testified that she has a cousin named Amilcar Alejandro Rivas, who was pictured in People's Exhibit 3 and "perhaps" six feet tall and "heavy, perhaps 145 pounds." She saw him about three days after seeing Paniagua being taken from his taxi; she saw on his left shoulder blade an injury that looked like he "had injured himself like with a stick or something." When police searched her apartment, she told the detectives that a camcorder belonging to Rivas was missing.[5] Moreno also testified that appellant had once used the name "Amilcar" when being arrested. She testified that she had two prior theft convictions, one in 2004 and one in 2007.

Badio also identified Rivas in People's Exhibit 3 and testified that he knew him as "Tito." He said Rivas was "just about the same height" as appellant, or "maybe a little bit shorter," but he was "a little heavier" at "around 150 or 155 pounds" and with a "wider" face. Before the incident, Badio had seen a camcorder inside his apartment belonging to Rivas. Badio never saw appellant pick it up, but he also said he was not home often.

Appellant's former girlfriend at the time of the shooting, Johana Bonilla, testified that during sexual intercourse she would give appellant "bites" or "hickies" on his neck, shoulders, and back because they gave him pleasure, and that the photographed bite on

---

[5]    Detective Tovar testified that Moreno told detectives that the camcorder was connected to her cousin "Eric Gonzalez." He also testified that during the search detectives found a traffic citation bearing the name "Eric Gonzalez" near appellant's bed, but did not recall showing it to Moreno at that time. During a subsequent telephone call, Moreno told Detective Tovar that appellant's cousin's name is "Eric Gonzalez" and "Tito." Moreno did not recall telling detectives that the camcorder belonged to Eric Gonzalez and denied being shown a traffic citation with the name "Eric Gonzalez" or "Eric Moreno Gonzalez" on it.

appellant's back was due to her. Appellant's work supervisor, Carlos Caceres, testified that he sometimes saw appellant with his shirt off and noticed appellant had hickies.

Caceres also testified that it was "fair to say that [appellant] worked on September 1st," although he was not "100 percent sure." Another of appellant's coworkers, Mauricio Bonilla, testified that he would drive appellant home from work in September 2009, but he could not specifically remember dropping him off on September 1.

Otto Paz, an eyewitness who lived across the street from appellant's apartment, testified he had stepped outside at some point before Paniagua stopped his vehicle in front of appellant's apartment. At the time it was "dark" but not "real late," and he saw appellant out on his balcony 15-18 feet away "relaxing." He went back inside and heard someone asking for help, so his daughter called 911. Paz noticed the "woman that lives next to" appellant "came out in a -- like a nightgown, and she stayed up there on the balcony just watching." After she was standing on the balcony, appellant "came out, he wasn't there for a long time, and then went in," and Paz did not remember seeing anyone else. Paz did not see Sierra's husband come out onto the balcony that night. Neither he nor his daughter were ever interviewed by police about the incident.[6]

Forensic psychologist Dr. Mitchell Eisen, an expert on eyewitness memory and suggestibility, testified that a witness's identification of a suspect in a six-pack photo lineup could possibly be influenced by showing him or her a video immediately afterward with the suspect just identified. He opined that giving an admonishment can avoid a witness feeling pressure to select someone from the lineup by assuming that the perpetrator appears there. The lineup should also be administered "double-blind," that is, without either the witness or the person administrating the lineup knowing whether the suspect's photo is included.

Dr. Eisen testified that descriptions of events right after a person experiences them tend to be more accurate than later descriptions; however, in a traumatic event, the trauma

---

[6] Officer Interiano testified that he did not see Paz at the scene and did not know whether officers interviewed Paz or any of the other 911 callers from that night. Detective Tovar did not follow up with any 911 callers and did not know if anyone else had.

8

creates a "massive distraction" that can limit the information a person can process during the experience. When a weapon is involved in a traumatic event, the weapon is often the focal point of the victim's attention, which can prevent the witness from accurately recalling the details of the perpetrator's face. He also testified that once someone has identified a suspect, whether correct or not, he or she will strive to make consistent future identifications, and a high level of confidence in an identification does not necessarily mean it is correct.

## DISCUSSION

### 1. Exclusion of Paniagua's Prior Misconduct

Appellant argues the court violated his federal and state constitutional rights to confrontation, to due process, and to presenting a meaningful defense by excluding evidence of Paniagua's prior conviction for selling cocaine and by prohibiting defense counsel from questioning Paniagua on his prior use of other names with police.

A criminal defendant's constitutional right to a fair trial includes the right to confront the prosecution's witnesses. (*People v. Ardoin* (2011) 196 Cal.App.4th 102, 118 (*Ardoin*).)[7] This right "'includes the right to cross-examine adverse witnesses on matters reflecting on their credibility.'" (*Ibid.*, quoting *People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 841-842.) However, not every restriction on cross-examination violates the defendant's rights, which "'"may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." [Citation.]'" (*Ibid.*) "'[A] trial court may restrict cross-examination on the basis of the well-established principles of Evidence Code section 352,[8] i.e., probative value versus undue prejudice. [Citation.]'" (*Id.* at p. 119.) There is no violation

---

[7] The California Constitution's guarantees to criminal defendants are coextensive with the United States Constitution. (Cal. Const., art. I, § 24.)

[8] Evidence Code section 352 states, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

"'unless the prohibited cross-examination might reasonably have produced a significantly different impression of credibility.'" (*Ibid.*)

We review the trial court's exclusion of evidence under Evidence Code section 352 for abuse of discretion. (*People v. Clair* (1992) 2 Cal.4th 629, 655 (*Clair*); *People v. Robinson* (2011) 199 Cal.App.4th 707, 716 (*Robinson*).) The trial court's decision "'will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Brown* (2003) 31 Cal.4th 518, 354.)

A. *Factual Background*

Defense counsel requested that the trial court admit evidence that Paniagua had a 1997 felony conviction for violating Health and Safety Code section 11351.5 (possession of cocaine base for sale). The court was "disinclined to allow it as an impeachment offense in this case" because it was 15 years old at the time of trial and "[t]here is nothing else on [Paniagua's] rap sheet that affects moral turpitude."[9]

During Paniagua's cross-examination, defense counsel asked if "Oscar Paniagua" was his "true name"; he replied, "Yes." Defense counsel then asked whether he had always gone by that name. The prosecutor objected on relevance grounds and the objection was sustained. Defense counsel next asked, "Have you ever lied to the cops about your name?"; the prosecutor again objected, and the objection was again sustained. Later, Detective Bland testified that a set of fingerprints from Paniagua's taxi was associated with the name "Sergio Antonio Lopez," who turned out to be Paniagua.

After Paniagua testified, appellant moved in limine to admit evidence that Paniagua had given a false name to police during his 1997 felony conviction and had told police that he had used several fake names in the past. The trial court denied the motion, explaining that it is "very common among Hispanics, especially those that may not be in this country

---

**9** The record is inconsistent whether Paniagua suffered the conviction in 1996 or 1997. The trial court calculated 15 years between the 1996 date and December 2011, when the trial began. The parties treat the conviction as occurring in 1997, and so shall we, although the one-year discrepancy is immaterial to our resolution of the issue.

with papers, that they have many -- or different identities that are utilized." The court noted that the incident "was so long ago" and that the evidence was "very marginally indicative of moral turpitude unless [defense counsel] can establish that there was some particular reason why he did it." Further, because appellant was not convicted of that offense, appellant "would have to be able to prove that with independent evidence" by having "under subpoena the officer to whom he supposedly gave the false name." The trial court considered the evidence of "negligible evidentiary value" and believed that defense counsel did not have a "good-faith offer of proof that you have these people under subpoena, that you could prove this act up," even though defense counsel claimed there were "admissions" by Paniagua that "he used fake names more than once, and one of them was for the drug arrest."

After the jury returned the verdicts, appellant moved for a new trial, arguing that the trial court's exclusion of Paniagua's prior conviction and preclusion of cross-examination on Paniagua's prior use of false names violated his right to a fair trial, confrontation, and due process. The motion was denied.

*B. Legal Standard*

A witness's prior felony conviction for possession of controlled substances for sale involves moral turpitude and is therefore admissible for impeachment, subject to Evidence Code section 352. (*Robinson, supra*, 199 Cal.App.4th at p. 712; *People v. Harris* (2005) 37 Cal.4th 310, 337; *People v. Castro* (1985) 38 Cal.3d 301, 317.) In applying Evidence Code section 352 to a prior conviction of a witness who is not the defendant, the trial court is mainly guided by two nonexclusive factors: "whether the conviction (1) reflects on honesty and (2) is near in time." (*Clair, supra*, 2 Cal.4th at p. 654.) Even in the absence of a felony conviction, prior acts involving moral turpitude are admissible for impeachment purposes, subject again to Evidence Code section 352. (*Harris, supra*, at p. 337; *People v. Wheeler* (1992) 4 Cal.4th 284, 295-296.) In order to prove prior misconduct for impeachment purposes, "a witness could admit the conduct or other witnesses could be called to describe the conduct." (*People v. Steele* (2000) 83 Cal.App.4th 212, 222.)

*C. Analysis*

While the exclusion of Paniagua's 1997 conviction was within the trial court's discretion under *Clair*, we find that the court abused its discretion in precluding defense counsel from cross-examining Paniagua on his use of a false name in connection with that conviction and on subsequent uses of false names with police officers. The evidence was unquestionably probative of Paniagua's credibility -- if he lied to police about his name on prior occasions, that certainly reflected on his truthfulness as a witness. The record not only reflects that he likely used a false name in connection with his 1997 conviction, but counsel also represented that Paniagua admitted using false names on other occasions. Yet, the court precluded counsel from developing that point, speculating that counsel did not have a "good-faith offer of proof" that police officers were needed as witnesses to testify that Paniagua had given false names to them. We find this comment difficult to understand, given that counsel represented that Paniagua had admitted he had done so, and Detective Bland testified that Paniagua's fingerprints were associated with at least one other name (and, based on the fingerprint specialist's testimony, likely more). Had Paniagua taken the stand and denied his prior use of other names, counsel had evidence to rebut that without calling the officers to whom Paniagua had given false names. The court should have permitted counsel to cross-examine Paniagua on that issue to elicit Paniagua's response.

We are also troubled by the trial court's speculation that Paniagua might have used other names for the stated reason that it was "very common among Hispanics, especially those that may not be in this country with papers, that they have many -- or different identities that are utilized." Nothing in the record suggested Paniagua had, in fact, used other names because he was Hispanic or that he was an undocumented immigrant. Evidence Code section 352 grants trial courts broad discretion, and as a reviewing court, we are reluctant to second-guess those decisions. "This discretion is not, however, unlimited, especially when its exercise hampers the ability of the defense to present evidence. While a trial judge has broad discretion to control the ultimate scope of cross-examination, wide latitude should be given to cross-examination designed to test the credibility of a prosecution witness in a criminal case." (*People v. Cooper* (1991) 53 Cal.3d 771, 816.)

12

This is one of the few instances in which the court exceeded the boundaries of its discretion. Broad assumptions like those discussed above, lacking any foundation in the evidence, should have no place in the court's weighing process.

Nonetheless, appellant suffered no prejudice because we do not believe this evidence "'might reasonably have produced a significantly different impression of [Paniagua's] credibility.'" (*Ardoin, supra*, 196 Cal.App.4th at p. 119.) Even though Paniagua testified that "Oscar Paniagua" was his true name, Detective Bland testified that Paniagua was associated with the name Sergio Antonio Lopez. A forensic print specialist also testified that Paniagua's fingerprints were associated with different names. Therefore, the jury could have inferred that Paniagua had given false names to law enforcement in the past and could have questioned his veracity on that basis. Moreover, the jury was told Paniagua did not have a driver's license on the night of the shooting, which would have called into question his honesty and veracity. These facts were at least as probative of Paniagua's veracity as his direct testimony about using other names. (See 196 Cal.App.4th at p. 122 [finding cumulative impeachment evidence would not have produced a different impression of witness's credibility].) Appellant has failed to demonstrate that reversal is warranted.

## 2. *Refusal to Give "Pinpoint" Jury Instruction*

Appellant contends that the trial court violated his rights to due process and to providing a defense by refusing to give a "pinpoint" instruction as part of CALCRIM No. 315, which he claims prevented the jury from focusing on whether Detective Bland tainted Paniagua's identification of appellant. We find no error, and even if there was error, it was harmless.

The standard version of CALCRIM No. 315 lists 15 questions that jurors can consider in evaluating the truthfulness and accuracy of eyewitness identification testimony, including the last question, "Were there any other circumstances affecting the witness's ability to make an accurate identification?"[10] Defense counsel requested that the court

_____

[10]    The court's full instruction stated:  "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an

13

include in this instruction a "pinpoint" instruction regarding influence during the identification procedure. Defense counsel initially requested in a pretrial brief that the following sentence be added: "Was the witness improperly influenced when he made an identification[?]" The trial court rejected the request, reasoning, "I think that the language in the instruction says, 'Were there any other circumstances affecting the witness's ability to make an accurate identification' covers that particular area. [¶] And even in what you say here, 'Was the witness improperly influenced?' He doesn't even have to be improperly influenced. [¶] It could be nothing really even improper that was done but somehow influenced the witness to make an identification, so I'm going to deny your request. I think it's covered in that sentence that I just read, and you can argue it." Defense counsel offered to amend the modification to state, "Was the witness influenced by law enforcement when he made an identification?" The court again rejected the request, noting, "I'm going to allow you to argue it, and I think it's covered in that one sentence that I indicated." Defense counsel raised this contention again in appellant's unsuccessful motion for a new trial.

---

eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: [¶] Did the witness know or have contact with the defendant before the event? [¶] How well could the witness see the perpetrator? [¶] What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation? [¶] How closely was the witness paying attention? [¶] Was the witness under stress when he or she made the observation? [¶] Did the witness give a description and how does that description compare to the defendant? [¶] How much time passed between the event and the time when the witness identified the defendant? [¶] Was the witness asked to pick the perpetrator out of a group? [¶] Did the witness ever fail to identify the defendant? [¶] Did the witness ever change his or her mind about the identification? [¶] How certain was the witness when he or she made an identification? [¶] Are the witness and the defendant of different races? [¶] Was the witness able to identify other participants in the crime? [¶] Was the witness about to identify the defendant in a photographic or physical lineup? [¶] Were there any other circumstances affecting the witness's ability to make an accurate identification? [¶] The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."

14

We find no error in the trial court's refusal to give appellant's requested instruction. "When a legally correct instruction is requested . . . it should be given 'if it is supported by substantial evidence, that is, evidence sufficient to deserve jury consideration.'" (*People v. Wilkins* (2013) 56 Cal.4th 333, 347.) Here, no such evidence existed. The only evidence supporting appellant's theory that Detective Bland improperly influenced Paniagua's identification by showing him the video after the six-pack photo lineup was testimony from appellant's eyewitness identification expert that influence under these circumstances was "possible." That testimony was insufficient to justify adding appellant's requested instruction to the factors listed in CALCRIM No. 315.

Even if the trial court erred in rejecting appellant's proposed modification to CALCRIM No. 315, any error was harmless under both *Chapman v. California* (1967) 386 U.S. 18, 24 (harmless beyond a reasonable doubt) and *People v. Watson* (1956) 46 Cal.2d 818, 836 (reasonable probability of a more favorable outcome). Nothing in CALCRIM No. 315 or any other instruction precluded appellant from offering evidence or arguments to support his theory that Paniagua's identification was tainted by his being shown the video so soon after being shown the six-pack photo lineup. And defense counsel cross-examined Detective Bland, offered testimony from an eyewitness expert on identifications, and argued in closing that Detective Bland influenced Paniagua's identification by showing him the video, bringing to the jury's attention appellant's defense theory.

Cases have repeatedly held that, under these circumstances, any error in refusing requested "pinpoint" instructions is harmless. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144 [finding no prejudice from refusal to give defense pinpoint instruction because other instructions did not preclude jury from finding for appellant and defense counsel otherwise "fully explicated" the defense to the jury]; *People v. Earp* (1999) 20 Cal.4th 826, 887 [finding no prejudice from refusal to give defendant's requested instructions because other instructions were adequate and the jury knew the defense theory from defense counsel's arguments]; *People v. Fudge* (1994) 7 Cal.4th 1075, 1111 [finding no prejudice from trial court's erroneous refusal to give instruction based on eyewitness identification expert's testimony in part because the court gave other eyewitness testimony instructions and

15

defense counsel summarized testimony in closing].) Because appellant fully presented and the jury was able to fully consider his theory even absent a specific instruction on influence during the identification process, any error was harmless and does not mandate reversal.

### 3. *Error in Sentencing Minute Order*

The parties agree that appellant's sentence on count 2 in the trial court's sentencing minute order did not accurately reflect the court's oral pronouncement. For count 2, the court orally imposed a sentence of "two years plus ten years for the gang enhancement, plus twenty-five years to life for the [section] 12022.53(d) allegation, the discharge causing great bodily injury." But the sentencing minute order incorrectly stated that his sentence on count 2 was "12 year[s] determinate and 37 years to life indeterminate." When an oral pronouncement of a sentence and a minute order conflict, the oral pronouncement generally controls. (*People v. Gonzalez* (2012) 210 Cal.App.4th 724, 744.)

## DISPOSITION

We direct the trial court to correct the sentencing minute order to reflect the court's oral pronouncement of appellant's sentence on count 2 as reflected in the reporter's transcript. In all other respects, the judgment is affirmed.


FLIER, J.

WE CONCUR:


BIGELOW, P. J.


RUBIN, J.


16