[No. B223311. Second Dist., Div. Eight. Sept. 28, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
LAMAR ROBINSON, Defendant and Appellant.

### COUNSEL

Johanna R. Pirko, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, James William Bilderback II and Alene M. Games, Deputy Attorneys General, for Plaintiff and Respondent.

### OPINION

### GRIMES, J.—

## SUMMARY

Defendant Lamar Robinson was charged with battery on a correctional officer (Pen. Code, § 4501.5) and with two prior conviction enhancements (Pen. Code, § 667.5, subd. (b)). The prosecution introduced evidence of defendant's prior conviction for being a felon in possession of a firearm, over defendant's objection (Pen. Code, § 12021, subd. (a)(1)). Defendant's first trial resulted in a mistrial after the jury deadlocked. The second trial resulted in a guilty verdict, and defendant was sentenced to five years in prison. On appeal, he contends (1) his prior conviction was inadmissible as a matter of law, as it was not a crime of moral turpitude; or alternatively, (2) even if the conviction was admissible, the trial court abused its discretion under Evidence Code section 352 by admitting it because it was minimally probative and highly prejudicial. We find no merit in defendant's arguments, and therefore affirm the judgment.

## FACTS

Defendant was incarcerated at the California State Prison in Lancaster. In the early afternoon on December 17, 2008, correctional officers were transferring defendant and 15 to 20 other inmates to a new housing facility at the

prison. It had been snowing, and the ground was slippery, covered in ice and snow. During transfers, inmates are required to walk along a yellow line and place their belongings on the ground when told to do so. Defendant knew of this rule, having received the manual of prison rules and regulations. Defendant was disgruntled because he did not want to be transferred to the "Five Block" housing facility. He did not follow orders to stand in a single-file line with his hands behind his back.

Officers handcuffed defendant and placed him in a holding cell in the program office so that he would not incite other prisoners. Defendant remained in the holding cell while the other inmates were processed. The prison's policy is that an inmate in the holding cell is to be checked on every 15 minutes. Officers discovered defendant had urinated on the floor of the holding cell. When asked about the urine, defendant responded, "I pissed on your floor." Defendant mopped up his urine as directed. There was no toilet in the holding cell, but no one heard defendant complain that he needed to use the restroom.

As defendant was escorted out of the program office, he continued to complain about the transfer. He asked to be housed in the "hole" instead. He did not say why he did not want to be transferred. Officers Jeff Riley and Michael Madelon guarded defendant while they waited for another officer to transfer him to Five Block. Madelon's radio had a low battery and started chirping, so he left defendant and Riley alone while he went to get a replacement battery. Riley ordered defendant to face the wall with his hands behind his back. Defendant complied but continued to rant that there was "no way" he was going to switch buildings. Riley ordered defendant to pick up his belongings and walk the yellow line. Defendant responded, "F--- you bitch"; "You f------ pick it up, bitch," and began walking away from Riley.

Defendant then walked away from his belongings and did not comply with Riley's order to stop. Officer Riley radioed the observation tower to "put the yard down," signaling an alarm requiring inmates to sit on the ground. Defendant refused to get on the ground. He was the only inmate in the yard at the time. As Riley approached him, defendant struck him in the chest with his elbow. Defendant exclaimed that he was going to "kick [their] ass," referring to the correctional officers. He then clenched his fist as if he were going to strike Riley, so Riley tackled him to the ground. Defendant landed on his stomach and refused to put his hands behind his back. He tried to bite Riley's arm. Four officers were eventually able to handcuff defendant. He yelled that he was "gonna get paid."

The officers helped defendant to his feet. However, his body suddenly went limp, pulling the officers to the ground. The officers had difficulty getting a foothold because the ground was slippery. Defendant commented, "This s--- is fun. . . . I ain't walkin' nowhere." When officers pulled defendant up, he again went limp and pulled everyone to the ground. He said, "This s--- was fun," and "I'm gonna get paid." He had blood on his face. He refused to get up, and the officers carried him to the holding cell in the program office. He did not complain that he was hurt. There were no other inmates present at the time.

Prison nurse Jillian Bojorquez treated defendant. His only injury was an abrasion on his face. He made an excessive force complaint, which was determined to be unsubstantiated.

Defendant testified at trial. He did not want to be transferred because the Five Block had higher security. When officers instructed defendant to place his property on the ground, he put his duffelbag down. He did not put his legal paperwork on the ground, because it had snowed and he did not want his papers to get wet. His papers were not placed in his duffelbag because it had holes in it, and the papers would get wet.

Defendant testified that he was placed in the holding cell for over three hours. He was never checked on, even though he was yelling that he needed to use a restroom. Eventually, he urinated on the floor.

After defendant was removed from the holding cell to be transferred to Five Block, he heard the "yard down" alarm. Defendant denied that he elbowed or tried to punch or bite Officer Riley. Riley did a leg sweep to knock defendant down. Defendant used his hands to break his fall, and Riley pressed the side of defendant's face into the concrete. Officers helped defendant to his feet, but he kept falling because his leg was hurt from the leg sweep. He told the officers that "this is not fun."

The prison nurse did not treat defendant even though he complained that his legs were broken. He was taken to the infirmary and given an ACE bandage for his leg, some pain medication, and some ointment for his face. After he was treated at the infirmary, he was placed in the holding cell to calm down before being taken to administrative segregation. While defendant was in the holding cell, the officers mocked and laughed at him while they wrote their reports.

Defendant's claim that he was in the holding cell for three hours was refuted with evidence from the nurse's report and a time stamp on a video of him in the holding cell that reflected that the whole incident, including defendant's medical treatment, occurred over the course of one and one-half hours.

## DISCUSSION

Defendant first contends that, as a matter of law, his prior conviction under Penal Code section 12021, subdivision (a)(1) did not involve moral turpitude and therefore was inadmissible. Alternatively, he contends that even if his prior conviction was one of moral turpitude, the trial court abused its discretion in admitting it under Evidence Code section 352. We conclude that a violation of Penal Code section 12021 is a crime of moral turpitude, and the probative value of the prior conviction was not outweighed by the risk of undue prejudice to defendant.

### 1. *Moral Turpitude*

■ Evidence of a prior conviction is admissible in a criminal case, subject to the limitations of Evidence Code section 352, so long as the conviction involves moral turpitude.[1] (*People v. Castro, supra,* 38 Cal.3d at p. 314 (*Castro*).) Moral turpitude is not limited to dishonesty, but extends to crimes that involve other sorts of moral depravity and a " 'readiness to do evil,' " such as child molestation and crimes of violence, torture, or brutality. (*Id.* at p. 315.) Whether a particular offense involves moral turpitude must be determined based on the statutory elements of the crime. The court may not consider the specific facts giving rise to the conviction but must conclude that each element of the crime, including the minimum statutory elements, involves moral turpitude. (*Id.* at pp. 316–317.) *Castro* requires "that from the elements of the offense alone—without regard to the facts of the particular violation—one can reasonably infer the presence of moral turpitude." (*People v. Thomas* (1988) 206 Cal.App.3d 689, 698 [254 Cal.Rptr. 15].) This aspect of the holding in *Castro* has come to be referred to as the "least adjudicated elements test."

The trial court permitted defendant to be impeached with his 2005 conviction for violation of Penal Code section 12021 (hereafter section

---

[1] See California Constitution, article I, section 28, subdivision (f), paragraph (4) ("Any prior felony conviction of any person in any criminal proceeding, whether adult or juvenile, shall subsequently be used without limitation for purposes of impeachment or enhancement of sentence in any criminal proceeding. When a prior felony conviction is an element of any felony offense, it shall be proven to the trier of fact in open court."). This expansive language has been narrowed by judicial decision on due process grounds, and therefore only crimes of moral turpitude are admissible in a criminal trial for impeachment purposes. (*People v. Castro* (1985) 38 Cal.3d 301, 313, 314 [211 Cal.Rptr. 719, 696 P.2d 111].)

12021) at both trials, concluding that the crime involved moral turpitude. Section 12021 provides, in relevant part: "Any person who has been convicted of a felony under the laws of the United States, the State of California, or any other state, government, or country or of an offense enumerated in subdivision (a), (b), or (d) of Section 12001.6, or who is addicted to the use of any narcotic drug, and who owns, purchases, receives, or has in his or her possession or under his or her custody or control any firearm is guilty of a felony." (§ 12021, subd. (a)(1).) "Firearm" is defined broadly, to include even inoperable firearms. (§ 12001, subds. (b), (c) ["As used in this title, 'firearm' means any device, designed to be used as a weapon, from which is expelled through a barrel, a projectile by the force of any explosion or other form of combustion. [¶] (c) As used in Section[] 12021 . . . , the term 'firearm' includes the frame or receiver of the weapon."]; see also *People v. Thompson* (1977) 72 Cal.App.3d 1, 5 [139 Cal.Rptr. 800].)

Several cases hold that possession of a firearm by a felon is a crime of moral turpitude, as it denotes a "readiness to do evil." (*People v. Littrel* (1986) 185 Cal.App.3d 699, 702–703 [230 Cal.Rptr. 83] (*Littrel*); *People v. Feaster* (2002) 102 Cal.App.4th 1084, 1092 [125 Cal.Rptr.2d 896] [citing *Littrel*, without analysis]; see *People v. Williams* (2009) 170 Cal.App.4th 587, 607–608 [88 Cal.Rptr.3d 401] [citing *Littrel*, without analysis].) Defendant seeks to distinguish these cases, reasoning that *Littrel* was decided under a previous version of section 12021, which prohibited possession of *concealable* firearms by felons and drug addicts (see fn. 2, *post*), whereas the current statute does not require that the weapon be concealable. Also, defendant contends that the *Littrel* court did not apply *Castro*'s "least adjudicated elements" test.

In *Littrel*, the court considered whether the crime of possession of a concealable firearm by a convicted felon (former § 12021)[2] is a crime of moral turpitude for the purpose of impeachment. It concluded, that "by enacting Penal Code section 12021, the State of California has decreed that it recognizes no legitimate use of a concealable firearm by a convicted felon. The statute is based on the theory that a convicted felon has, by his prior

---

[2] At the time *Littrel* was decided, section 12021 provided, in pertinent part: " '(a) Any person who has been convicted of a felony under the laws of the United States, of the State of California, or any other state, government, or country, or of an offense enumerated in Section 12001.6, or who is addicted to the use of any narcotic drug, who owns or has in his possession or under his custody or control any pistol, revolver, or other firearm capable of being concealed upon the person is guilty of a public offense, and shall be punishable by imprisonment in the state prison, or in a county jail not exceeding one year or by a fine not exceeding one thousand dollars ($1,000), or by both.' " (*Littrel, supra*, 185 Cal.App.3d at p. 703, fn. 2, quoting former § 12021, subd. (a), amended by Stats. 1989, ch. 1044, § 3, p. 3633.) The "concealable" language is the only material difference between the former and present versions of the statute for our purposes.

conduct, demonstrated that if he comes into possession of a concealable firearm, he will use it to do evil. Therefore, we conclude that possession of a firearm by a felon is a crime involving moral turpitude." (*Littrel, supra,* 185 Cal.App.3d at pp. 702–703, fn. omitted.) The court relied on *Castro* but did not discuss *Castro's* reference to the "least adjudicated elements" in holding that the crime of possession of a concealable firearm by a convicted felon involves moral turpitude. (*Littrel,* at pp. 702–703.)

■ Defendant maintains the elements of section 12021 do not "necessarily" involve moral turpitude, because the statute "criminalizes the possession of inoperable firearms and firearms routinely possessed for an innocent purpose." But the test for determining whether a felony involves moral turpitude is not whether one can "imagine a set of circumstances under which a penal statute can be violated without moral fault." "[R]eading *Castro* to preclude use of a prior conviction for the purpose of impeachment if there is any conceivable set of facts under which the offense could have been committed free of moral blame would mean that no prior conviction could ever be used for impeachment. Certainly that is not what the Supreme Court intended by its ruling in *Castro.*" (*People v. Thomas, supra,* 206 Cal.App.3d at p. 698.) We reject defendant's contention that section 12021 may be violated "innocently" and without moral blame.

When it amended section 12021 to delete the requirement that the firearm be "concealable," the Legislature clearly recognized the danger of permitting felons and drug addicts to possess firearms. The purpose of section 12021 is to protect the public welfare by precluding the possession of guns by those who are more likely to use them for improper purposes. "Due to the potential for death or great bodily injury from the improper use of firearms, public policy generally abhors even momentary possession of guns by convicted felons who, the Legislature has found, are more likely to misuse them." (*People v. Pepper* (1996) 41 Cal.App.4th 1029, 1037–1038 [48 Cal.Rptr.2d 877].)

The cases relied upon by defendant do not convince us otherwise. In *People v. Garrett* (1987) 195 Cal.App.3d 795 [241 Cal.Rptr. 10] (*Garrett*), the defendant argued that his conviction for conspiracy to possess an unregistered sawed-off shotgun (a violation of federal law) was not a crime of moral turpitude. (*Id.* at p. 798.) The elements of the crime required proof that the defendant and another agreed to possess unregistered firearms and that one of the two did an overt act in furtherance of the agreement. (*Id.* at p. 799.) "Firearm" was defined to include various modified or altered guns, and the

legislative history of the act indicated that Congress intended to promote law and order by proscribing original and converted military-type weapons as well as improvised types of similar " 'devices and weapons of crime, violence and destruction.' " (*Ibid.*) "Notably excluded from the definition of 'firearms' subject to regulation are those weapons which commonly are possessed for an 'innocent' purpose: antique weapons, pistols and revolvers having rifled bores, weapons intended to be fired from the shoulder, and firearms incapable of discharging a shot. . . . The weapons required to be registered . . . are insidious instruments normally used for criminal purposes. Their mere possession in violation of the statute is indicative of a 'readiness to do evil.' A violation of 26 United States Code section 5861(d) thus involves moral turpitude." (*Garrett*, at p. 800, citation omitted.)

Defendant has seized on this language in *Garrett* (concerning "weapons which commonly are possessed for an 'innocent purpose' "), reasoning that because section 12021 reaches firearms that are not insidious, such as antique and inoperable firearms, a violation of this section does not necessarily evince a readiness to do evil. However, section 12021 differs from the sections of the United States Code at issue in *Garrett*, because section 12021 is not concerned with the characteristics of the *firearm*, but rather with the characteristics of the *felon in possession* of the firearm. In *Garrett*, the danger flowed from the insidious nature of the firearm, whereas our law's focus is on the danger inherent in having "any firearm" in the possession of a felon. (§ 12021, subd. (a)(1).) Therefore, defendant's reliance on *Garrett* is misplaced.

*People v. Mansfield* (1988) 200 Cal.App.3d 82 [245 Cal.Rptr. 800] is similarly unpersuasive. In that case, the court concluded that felony battery (Pen. Code, § 243) was not a crime of moral turpitude because " ' "the least [amount of] touching" ' " constitutes battery. (*People v. Mansfield*, at p. 88.) The court concluded that because battery "can occur from the least offensive 'push,' it is not a crime of moral turpitude." (*Id.* at p. 89.) "The average person walking down the street would not believe that someone who [merely] pushes another is a culprit guilty of moral laxity or 'general readiness to do evil,' even if the push was willful and results in serious injury." (*Ibid.*) In contrast, the average person walking down the street would naturally believe that a felon in possession of a firearm is ready to do evil, as there is always a potential for deadly violence when a felon is in possession of a firearm.

Therefore, because a violation of section 12021 is a crime of moral turpitude, the trial court did not err as a matter of law in allowing the use of the conviction for impeachment.

## 2. *Evidence Code Section 352*

■ Defendant next contends that even if the crime involved moral turpitude, the trial court abused its discretion by failing to exclude it under Evidence Code section 352. (*Castro, supra*, 38 Cal.3d at p. 317 [admission is subject to Evid. Code, § 352].) Evidence Code section 352 vests the court with discretion to exclude evidence, where the probative value of the evidence is outweighed by a substantial danger of undue prejudice, confusion of the issues, or misleading the jury. (*Id.*, § 352.) Admissibility of impeachment evidence under the Evidence Code section 352 balancing test may involve an inquiry into (1) whether the prior conviction reflects on honesty, (2) whether it is remote in time, (3) whether it is similar to the conduct for which the witness-accused is on trial, and (4) what effect admission would have on the defendant's decision to testify. (*Castro, supra*, 38 Cal.3d at p. 307.) These factors are not rigid standards, but rather are suggested considerations. (*Ibid.*)

The record shows the trial court conducted a thoughtful Evidence Code section 352 analysis before deciding to admit the evidence, concluding that "[u]nder 352 it is relevant to his credibility. It is not remote. It's different in terms of the charges here so I don't see any undue prejudice." Defendant was going to dispute the truth of virtually every significant fact to which the correctional officers testified, setting up a clear credibility contest. " ' "[A] witness's moral depravity of any kind has some 'tendency in reason' . . . to shake one's confidence in his honesty." ' " (*People v. Chavez* (2000) 84 Cal.App.4th 25, 29 [100 Cal.Rptr.2d 680], citation omitted.) None of the Evidence Code section 352 factors weighed in favor of exclusion. The crime was not remote (the conviction was from 2005), the crime was not at all similar to the charged crime, and the conviction clearly did not discourage defendant from testifying at trial.

The trial court did not exceed the bounds of reason in admitting the evidence, but reasonably concluded that evidence relating to defendant's credibility was probative and necessary to the jury's consideration of the case, and not outweighed by a substantial danger that the jury would consider it for improper purposes.[3] We will not interfere with the trial court's discretion unless it was clearly abused. (*People v. Stewart* (1985) 171 Cal.App.3d 59, 65–66 [215 Cal.Rptr. 716].)

---

[3] The jury was instructed: "The fact that a witness has been convicted of a felony, if this is a fact, may be considered by you only for the purpose of determining the believability of that witness. The fact of a conviction does not necessarily destroy or impair a witness's believability. It is one of the circumstances that you may consider in weighing the testimony of that witness."

## DISPOSITION

The judgment is affirmed.

Bigelow, P. J., and Flier, J., concurred.

A petition for a rehearing was denied October 21, 2011, and appellant's petition for review by the Supreme Court was denied January 4, 2012, S197977.