Filed 1/6/14  P. v. Baker CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DOMINIQUE BAKER,<br><br>    Defendant and Appellant. | F065476<br><br>(Kings Super. Ct. No. 11CM7514)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kings County.  Steven D. Barnes, Judge.

John Hardesty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kathleen A. McKenna and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**INTRODUCTION**

Appellant/defendant Dominique Baker, an inmate in the security housing unit (SHU) at Corcoran State Prison, was convicted after a jury trial of battery by a prison inmate upon a nonconfined person (Pen. Code,[1] § 4501.5), with special allegations found true that he had two prior strike convictions (§ 667, subds. (b)-(i); § 1170.12, subds. (a)-(d)) and two prior prison term enhancements (§ 667.5, subd. (b)). He was sentenced to the third strike term of 25 years to life plus two years for the prior prison term enhancements.

On appeal, defendant contends he was improperly impeached with prior convictions identical to the charged offense; the court improperly reunified the jury trial on both the substantive offense and the special allegations; the prosecutor committed numerous instances of alleged misconduct; and his third strike term must be reversed. We affirm.

**FACTS**

On the morning of April 23, 2011, defendant was housed in Corcoran's SHU, and scheduled to receive prescription medication. Phillip Kemmpf, a nurse at the prison, was assigned the task of dispensing the medication to defendant, and ensuring that he swallowed it. Kemmpf testified the standard procedure was for a nurse and officer to go to the inmate's cell and hand the medication to him. The inmate had to consent to take the medication. If the inmate accepted the medication and consented, then the nurse had to make sure he swallowed it.

Kemmpf testified he previously had problems with defendant "cheeking" his medication, which meant he placed it between his cheek and gums instead of swallowing it. On some occasions, defendant hid the medication in his hand, or dropped it on the floor while pretending to ingest it. These incidents had occurred five or six times.

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

2.

On that particular morning, Kemmpf asked a correctional officer to move defendant from his cell and place him in a holding cell in the rotunda area. Kemmpf testified this was a standard procedure to administer medication to an inmate who had previously tried to "cheek" it. The holding cell provided better lighting conditions and an unobstructed view of the inmate to make sure he swallowed the medication.

Corrections Officers Phillip Holguin and Humberto German responded to Kemmpf's request. They went to defendant's cell and advised him that they were moving him to the rotunda area so the nurse could administer his medication and make sure he took it. Defendant was not happy about being moved and said he felt disrespected. The officers again explained the nurse wanted him moved to another area to administer his medication. Defendant agreed.

The officers entered his cell and conducted an unclothed body search of him, pursuant to operational procedures. They placed him in handcuffs and escorted him to the rotunda area. As they walked to the rotunda, defendant became belligerent, yelled at the officers, and used foul language. They arrived at the rotunda area and the officers placed him in the holding cell. Defendant remained in handcuffs in the holding cell.

Kemmpf testified he approached defendant from outside the holding cell and asked if he wanted his medication. Defendant became "verbally abusive" and directed obscenities at Kemmpf and the officers. Defendant said Kemmpf had "gone too far" by putting him through the process of moving him to the holding cell. Kemmpf tried to convince defendant to take his medication, and defendant continued to be verbally abusive.

During this exchange, the officers remained by the holding cell and told defendant to calm down. Kemmpf testified the officers told defendant they were " 'not going to tolerate' " his verbal abuse. The officers told defendant: " 'If you want your medication just take it; if you don't want it we'll take you back to housing.' "

After about 10 minutes, Kemmpf told defendant: " 'Look, do you want it or not? I'm not going to argue with you anymore. Do you want your medication or not?' " Defendant said he would take the medication. Kemmpf left the holding cell and went to the nursing office to get the medication.

Officer German testified he reached through the food port and removed defendant's handcuffs so he could take the medication. Defendant grabbed German's right wrist through the food port, and pulled German's hand and arm into the cell. Defendant screamed obscenities at him. German could not break free of defendant's grasp. German reached for his pepper spray canister with his left hand and sprayed defendant's face with one burst. The spray went on defendant's face and upper torso. Defendant released German's wrist and retreated to the back of the cell. German testified it was fairly common for inmates to assault officers through the food port, and officers were permitted to use pepper spray under such circumstances.

Kemmpf was in the nurse's office when he heard noise from the holding cell. He did not see the assault or the administration of pepper spray. When he returned to the area, the two officers were still standing by the holding cell, and Kemmpf realized they had used pepper spray on defendant. Kemmpf saw the distinctive orange-and-red-colored pepper spray on the front of defendant's chest and head, and on the back wall of the holding cell. Some of the pepper spray was on the back of defendant's head and shirt. Kemmpf believed defendant had received "one good burst" of pepper spray. It was not "dripping" off him, and he had not been "doused."

As a result of defendant's assault, German reported he had "a little red area on [his] wrist for a couple of days" and a "little bit of pain," but "nothing major."

## DEFENSE EVIDENCE

Defendant testified he received medication for a mood disorder. It was usually dispensed by a nurse who would come to his cell. The nurse placed the medication in his

4.

hand, and he swallowed it with water. Defendant testified he never "cheek[ed]" his medication or refused to take it.

Defendant testified that on the day of the incident, the officers removed him from his cell and escorted him to the rotunda area. Defendant felt he was being singled out. He had recently been moved into that housing unit, and he wanted to stop something before it became an everyday procedure. He told the officers this was not the correct procedure for his medication.

Defendant admitted he felt disrespected and upset about the procedure, and did not like how he was being escorted to the rotunda area. Defendant testified the officers became "loud" and "a little aggressive" when he complained. Defendant admitted he became verbally aggressive and confrontational, but testified he never tried to touch the officers.

Defendant testified his handcuffs were released when he was placed in the holding cell. He admitted he used profanity after he was placed in the holding cell. He eventually asked for water to take his medication and again tried to explain the usual medication procedure. Defendant testified Officer German suddenly used pepper spray on him. Defendant couldn't see, and he sat down in the holding cell. Defendant testified he got "real loud" and "real upset" about what happened, and he was sprayed again. Defendant was disoriented and couldn't see, and he heard Officer Holguin say, " 'Now you can live like Ray Charles.' "

On cross-examination, defendant admitted inmates are placed in the SHU because they are disruptive or have caused problems. Defendant admitted he was convicted of carjacking in 1995, robbery in 1996, theft with prior theft convictions in 2005, and two counts of battery by a prisoner on a nonprisoner in 2009.

**Devonte Harris**

Devonte Harris, another inmate, testified for the defense. He was previously convicted of two counts of kidnapping to commit robbery and robbery in 2000.

5.

Harris testified about an alleged encounter he had with Officers German and Holguin. On February 24, 2011, Harris was housed in the Corcoran SHU because of rule violations. German and Holguin were about to process and escort him to the yard. Harris complained to them and said his access to the yard was being delayed.

Harris testified as they escorted him to the yard, Holguin pressed him against the wall. German told Harris to shut up and not to say anything since he was getting his yard time. German aggressively yanked Harris's arm, forced Harris to stop, and told him not to walk unless told to do so.

Harris testified a sergeant was nearby and asked what was going on. Harris was about to complain when German yanked Harris's arm to stop him. German told Harris: " 'I thought I said don't say a word.' " The sergeant told the officers to return Harris to his cell.

Harris testified that instead of going back to his cell, Holguin and German took him to the rotunda office. Holguin shoved Harris into the wall. Holguin held Harris by the neck and continued to push his face into the wall. German kicked Harris's legs far apart, as if he was forcing Harris to do the splits. Both officers verbally threatened him. The sergeant again appeared, and Harris said he wanted to file a complaint for excessive force.

Harris testified he suffered a swollen cheek, pain on the right side of his chest and his back, and needed ice on his forehead. Harris testified he filed a complaint against the officers. He admitted that he had filed numerous administrative complaints and lawsuits against other correctional officers. He denied that he threatened other officers with taking their bank accounts because of his numerous lawsuits.

## REBUTTAL

Officer German testified he was not punished, reprimanded, or disciplined for his conduct during the incident with defendant.

6.

Officer German testified he did not assault or threaten Harris as Harris claimed. Harris was irate and resisted being escorted to the yard. Harris filed a complaint against German because of the alleged yard incident. German testified he went through an investigation by internal affairs. He could have lost his job or his pay. However, he was not reprimanded or punished in any way. German believed Harris provoked incidents with numerous correctional officers so he could file lawsuits against them.

Correctional Sergeant Jesus Martinez testified Harris was disruptive and frequently filed complaints and lawsuits against officers. Harris had threatened Martinez and other officers that he would take their money and their jobs as a result of his lawsuits. Martinez refuted Harris's account of the yard incident, and testified Harris was being disruptive and refused to comply with the officers' orders as they escorted him to the yard. Martinez saw Harris's face that day and did not see any injuries.

## DISCUSSION

### I. Impeachment with prior convictions

Defendant contends the court improperly permitted him to be impeached with his two prior convictions for battery by a prisoner on a nonconfined person (§ 4501.5). Defendant asserts impeachment with those convictions was prejudicial because they were identical to the charged offense, and the court failed to conduct the appropriate prejudice analysis.

#### A. Background

As we will discuss further in issue II, *post*, defense counsel advised the court that defendant would testify. Counsel stated he advised defendant he would be impeached with his prior convictions, and defendant said he understood and still wanted to testify. The court replied that if defendant testified, his criminal history would be admissible to impeach him because his prior convictions were "moral turpitude crimes, right?" Defense counsel said yes.

When defendant testified, he admitted he had prior felony convictions for carjacking in 1995, robbery in 1996, theft with prior theft convictions in 2005, and two prior convictions for battery by a prisoner on a nonconfined person in violation of section 4501.5. Defense counsel did not object to the impeachment.

## B. Analysis

We first note defense counsel did not object to the court's ruling that defendant would be impeached with his prior convictions and cannot raise this issue on appeal. (*People v. Hines* (1997) 15 Cal.4th 997, 1030.) In the alternative, defendant argues defense counsel was prejudicially ineffective for failing to object to impeachment with his prior violations of section 4501.5. "To establish ineffective assistance, defendant bears the burden of showing, first, that counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms. Second, a defendant must establish that, absent counsel's error, it is reasonably probable that the verdict would have been more favorable to him. [Citations.]" (*People v. Hawkins* (1995) 10 Cal.4th 920, 940, overruled on other grounds in *People v. Lasko* (2000) 23 Cal.4th 101, 110 and *People v. Blakeley* (2000) 23 Cal.4th 82, 89.) We thus turn to the merits.

Evidence that a witness has a prior felony conviction involving moral turpitude is admissible to attack the witness's credibility, subject to a determination of prejudice under Evidence Code section 352. (Cal. Const., art. I, § 28, subd. (f); Evid. Code, § 788; *People v. Castro* (1985) 38 Cal.3d 301, 306, 313-317; *People v. Robinson* (2011) 199 Cal.App.4th 707, 712.)

Moral turpitude is not limited to dishonesty, but extends to crimes that involve other sorts of moral depravity and a readiness to do evil. (*People v. Castro, supra,* 38 Cal.3d at p. 315; *People v. Robinson*, *supra*, 199 Cal.App.4th at p. 712.) Moral turpitude has also been defined to include "conduct involving violence, menace or threats

8.

[citations]." (*People v. Lepolo* (1997) 55 Cal.App.4th 85, 90; *People v. Williams* (1999) 72 Cal.App.4th 1460, 1464.)

Defendant concedes his prior convictions for carjacking, robbery, theft with prior theft-related offenses, and battery by a prisoner on a nonconfined person were offenses of moral turpitude and could be used to impeach his trial testimony. (See, e.g., *People v. Mendoza* (2000) 78 Cal.App.4th 918, 925; *People v. Gray* (2007) 158 Cal.App.4th 635, 641; *People v. Waldecker* (1987) 195 Cal.App.3d 1152, 1156; *People v. Clarida* (1987) 197 Cal.App.3d 547, 552; *People v. Williams*, *supra*, 72 Cal.App.4th at pp. 1464-1465.)

However, defendant asserts defense counsel should have argued that impeachment with the two violations of section 4501.5 was unduly prejudicial pursuant to Evidence Code section 352 because he was being tried for committing the same offense. In exercising discretion under Evidence Code section 352, the court should consider whether the prior conviction reflects lack of honesty and integrity, the remoteness in time of the priors to the current offense, whether the priors concern the same or substantially similar conduct to the current offense, and the effect the admission of the priors would have on the defendant's decision to testify due to fear of impeachment. (*People v. Muldrow* (1988) 202 Cal.App.3d 636, 644.)

"Prior convictions for the identical offense are not automatically excluded. 'The identity or similarity of current and impeaching offenses is just one factor to be considered by the trial court in exercising its discretion.' [Citation.]" (*People v. Green* (1995) 34 Cal.App.4th 165, 183; *People v. Mendoza*, *supra*, 78 Cal.App.4th at p. 925.) The court does not abuse its discretion if it decides to permit impeachment with a prior conviction which is similar to the charged offense. (See, e.g., *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1139; *People v. Tamborrino* (1989) 215 Cal.App.3d 575, 590.)

In addition, there is no limitation on the number of prior felonies admitted for impeachment, and that is simply one of the factors which must be weighed against the danger of prejudice. (*People v. Muldrow*, *supra*, 202 Cal.App.3d at p. 636.) For

example, "the admission of [four identical] prior convictions for impeachment is not precluded as a matter of law [citation], and a series of crimes may be more probative than a single crime,…" (*People v. Green*, *supra*, 34 Cal.App.4th at p. 183.)

Defendant's prior convictions and the charged offense were for violations of section 4501.5, which is violated when a person who is "confined in a state prison of this state … commits a battery upon the person of any individual who is not himself a person confined …." A violation of section 4501.5 is often described as battery by a prisoner on a correctional officer. (See, e.g., *People v. Robinson*, *supra*, 199 Cal.App.4th at p. 709; *People v. Jefferson* (2004) 119 Cal.App.4th 508, 510; *People v. Flores* (2009) 176 Cal.App.4th 924, 930-931.) Defendant committed the prior violations in 2007, while he was confined in state prison, and he was convicted and sentenced in 2009.

Defendant asserts the two section 4501.5 violations were unduly prejudicial because they improperly advised the jury that he had behavioral problems in prison. However, we cannot say the court would have abused its discretion to permit impeachment with the section 4501.5 offenses if defense counsel raised a prejudice objection. Defendant testified and was properly impeached with three theft-related offenses of moral turpitude – robbery, carjacking, and theft with a prior theft-related conviction. Defendant admitted he was housed in the Corcoran SHU when the incident in this case occurred. Defendant further admitted inmates are placed in the SHU because they are disruptive or have caused problems, he became verbally abusive and felt disrespected when the officers escorted him to the holding cell, and he felt he was being singled out by the procedure. The very nature of defendant's circumstances indicated to the jury he had already demonstrated disruptive behavior in the prison setting.

Even assuming the court would have excluded the two prior section 4501.5 convictions as prejudicial, any error in the erroneous admission of evidence is a ground for reversal "only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to

10.

the appealing party would have been reached in the absence of the error…." (*People v. Watson* (1956) 46 Cal.2d 818, 836; see also Evid. Code, § 353; *People v. Marks* (2003) 31 Cal.4th 197, 226-227.) There was no reasonable probability of a more favorable result for defendant. Given the very nature of the charged offense, the jury was aware defendant was an inmate in state prison, and housed in the SHU. The critical evidence about defendant's disruptive behavior was provided by Kemmpf, the nurse, who described defendant's previous and repeated "cheeking" of medication, the need to move him to the holding cell to ensure he took his medication, and his verbally abusive and obscenity-laced tirades as Kemmpf tried to convince him to take his medication. The two prior convictions were no more prejudicial than the evidence in support of the charged offense.

## II.  Unification of substantive charge and special allegations

At the beginning of trial, the court granted defendant's motion to bifurcate the charged offense from the prior conviction allegations. However, the court reconsidered and reversed that ruling when defendant decided to testify, and reunified the jury trial on the substantive offense with the special allegations.

Defendant contends the court improperly withdrew its bifurcation order and ordered a unified jury trial of both the substantive charge and special allegations. Defendant asserts the documentary evidence introduced to prove the prior convictions was extremely prejudicial and referred to matters beyond the facts of his prior convictions.

### A.  Background

In addition to the substantive charge, the amended information alleged defendant had two prior strike convictions from Los Angeles County for (1) carjacking in February 1996 (§ 215, subd. (a)); and (2) robbery in September 1996 (§ 211). It was also alleged he had two prior prison term enhancements based on (1) the same robbery conviction in

11.

September 1996; and (2) petty theft with a prior theft-related conviction in March 2005 (§ 666).

On the first day of trial, defense counsel requested bifurcation of the prior conviction allegations from the substantive charge. The court replied:

> "All right, which means that we're going to try separately the strike prior and prison priors; *however, if [defendant] determines that he's going to testify we'll unbifurcate because he'll be subject to cross examination.*" (Italics added.)

Defense counsel did not object.

After the prosecution rested, defense counsel advised the court outside the jury's presence that defendant would testify. Counsel stated he informed defendant "the consequence of testifying is that this bifurcated proceeding would then become unbifurcated," his prior convictions would be admissible, and the jury would learn about his criminal history.

The court asked defendant if he understood and still wanted to testify. Defendant said, "Yes."

> "THE COURT: [¶] And, then with reference to original motion that you made to bifurcate the proceedings you're noting that we would essentially unbifurcate the proceedings and the jury would then make a decision, in this case, in the People's case-in-chief with reference to not only the underlying offense but the strike priors and the prison priors, correct?
>
> "[DEFENSE COUNSEL]: To be clear, *I'm not asking to unbifurcate*, I'm just indicating our intention that my client is going to testify and I know it's probable that the Court will entertain a motion to unbifurcate.
>
> "THE COURT: That's because when he testifies his criminal history will be admissible because it's moral turpitude crimes, right?
>
> "[DEFENSE COUNSEL]: Yes." (Italics added.)

12.

The prosecutor moved to "unbifurcate," and to reopen his case to introduce the documentary evidence in support of the special allegations and his prior convictions. Defense counsel replied that was reasonable. The court stated it would read the allegations to the jury, and the prosecutor could introduce the relevant evidence and advise the jury the issue was now before them.

When the jury returned, the prosecutor introduced the documentary evidence about the prior convictions. The court asked if there were any objections and defense counsel said no. The court read the special allegations to the jury, that defendant pleaded not guilty, and the jury would determine the truth of those allegations. The jury subsequently found the special allegations true.

### B.     Analysis

A trial court's broad discretion to control the conduct of a criminal trial includes the authority to bifurcate the determination of the truth of a prior-conviction allegation from the determination of guilt of the charged offense. (*People v. Calderon* (1994) 9 Cal.4th 69, 75 (*Calderon*).) The primary consideration for the trial court in ruling on a request to bifurcate a sentence enhancement is whether the admission of evidence relating to the enhancement during the trial on the charged offenses would pose a substantial risk of undue prejudice to the defendant. (*Id*. at pp. 77-78; *People v. Burch* (2007) 148 Cal.App.4th 862, 866 (*Burch*).)

"[B]ifurcation is *not* required *in every instance*. In some cases, a trial court properly may determine, prior to trial, that a unitary trial of the defendant's guilt or innocence of the charged offense and of the truth of a prior conviction allegation will not unduly prejudice the defendant…." (*Calderon*, *supra,* 9 Cal.4th at p. 78, italics in original.) The denial of bifurcation will not unduly prejudice the defendant when, "even if bifurcation were ordered, the jury still would learn of the existence of the prior conviction before returning a verdict of guilty…." (*Ibid*.)

For example, "when it is clear prior to trial that the defendant will testify and be impeached with evidence of the prior conviction [citation], denial of a request for a bifurcated trial generally would not expose the jury to any additional prejudicial evidence concerning the defendant…." (*Calderon*, *supra*, 9 Cal.4th at p. 78, fn. omitted.)

The determination of whether the risk of undue prejudice to the defendant requires bifurcation is within the sound discretion of the trial court, and subject to reversal only for an abuse of that discretion. (*Calderon, supra,* 9 Cal.4th at p. 79; *Burch*, *supra*, 148 Cal.App.4th at p. 867.)

In this case, the court did not abuse its discretion when it decided to reunify the proceedings and deny bifurcation once defendant decided to testify. As we have already explained, defendant's trial testimony was properly impeached with his prior convictions for carjacking, robbery, theft with prior theft-related convictions, and battery by a prisoner on a nonconfined person.

The three theft-related prior convictions were the basis for the prior strike allegations and prior prison term enhancements, and were placed before the jury when the court decided to reunify the trial. These prior convictions were offenses of moral turpitude and properly used to impeach his testimony. Thus, the court's decision to reconsider bifurcation, and reunify the jury trial on the substantive charge with the special allegations, did not subject defendant to prejudice beyond that from the appropriate impeachment of his trial testimony with the same prior convictions.

Defendant contends we should disregard *Calderon* and instead follow an earlier decision from this court in *People v. Martinez* (1985) 175 Cal.App.3d 881 (*Martinez*). However, *Martinez* was effectively overruled by *Calderon*. In *Martinez,* this court followed the "judicial rule of practice" stated in *People v. Bracamonte* (1981) 119 Cal.App.3d 644, 654, that whenever a defendant pleads not guilty of prior convictions he is entitled to a bifurcated proceeding. (*Martinez, supra,* 175 Cal.App.3d at p. 892.) In *Calderon,* however, the California Supreme Court expressly disavowed the *Bracamonte*

14.

rule, and held that a unitary trial is acceptable where the trial court has determined that it will not prejudice the defendant. (*Calderon, supra,* 9 Cal.4th at pp. 72, 78.) Since *Martinez* was premised on the *Bracamonte* rule, it is no longer persuasive authority.

Defendant further contends the prosecution's documentary evidence introduced to prove the prior convictions included prejudicial details beyond the facts of his prior convictions, including notations about the prison terms imposed for those convictions, and his multiple violations of prison rules and loss of credits. Defendant argues the jury could have interpreted the unredacted records to mean he was a person with a criminal disposition, who repeatedly broke prison rules and committed the charged offense.

The prosecution introduced defendant's prison records pursuant to section 969b, which provides that certified copies of state prison records are prima facie evidence that a defendant has been convicted of a crime and served a prison term. (See, e.g., *People v. Pearl* (2009) 172 Cal.App.4th 1280, 1286; *People v. Scott* (2000) 85 Cal.App.4th 905, 910-911.) In addition to evidence of the prior convictions, the records contained numerous abbreviations and notations such a "WCL," "WC LOSS," and "BCL." These terms were not otherwise defined, and it is speculative to conclude the jury equated these terms with rule violations.

Although it may be better practice to redact prison packets admitted to show prior convictions or prison terms, we cannot say that allowing the admission of defendant's unredacted prison packet in this case exceeded the bounds of reason. Defendant was properly impeached with several prior convictions of moral turpitude, thus raising the obvious inference that he was sentenced to prison for those felony convictions. He testified he was housed in Corcoran's SHU, and admitted that inmates are placed in SHU because they are disruptive or have caused problems in the prison. Kemmpf testified about defendant's prior disruptive behavior when he previously refused to take his medication, and his verbally abusive and resistant conduct on the day of the incident.

15.

Defendant asserts that while defense counsel initially moved for bifurcation, counsel was prejudicially ineffective for acquiescing to the court's decision to reunify the trial. However, defendant cannot demonstrate prejudice because, as discussed above, the trial court did not abuse its discretion by admitting the prior convictions for impeachment purposes or by reunifying the trial as a result of defendant's decision to testify.

## III.    Due process

Defendant argues his trial was fundamentally unfair as a result of the reunification of his trial, the jury's review of the unredacted documentary evidence, and the use of his prior violations of section 4501.5 to impeach his trial testimony.

Defendant's failure to raise due process objections to these evidentiary issues necessarily precludes review of this issue. (*People v. Partida* (2005) 37 Cal.4th 428, 435-436.) In any event, the admission of evidence may violate due process only if there is no permissible inference a jury may draw from the evidence. (*People v. Steele* (2002) 27 Cal.4th 1230, 1246.) In addition, a court's decision to deny bifurcation requires reversal only if defendant shows "the failure to bifurcate resulted in ' " 'gross unfairness' amounting to a denial of due process." ' [Citations.]" (*Burch*, *supra*, 148 Cal.App.4th at p. 867.)

As we have explained, there were clearly permissible inferences to draw from the evidence, which was properly admitted to impeach his credibility and prove the special allegations. Moreover, "the admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*. [Citations.]" (*People v. Partida, supra,* 37 Cal.4th 428, 439, italics in original.) Given the nature of the admissible evidence in this case, defendant's trial was not fundamentally unfair and his due process rights were not violated.

16.

**IV.** **Prosecutorial misconduct; German's testimony about Harris's excessive force claim**

Defendant raises several instances of alleged prosecutorial misconduct, which we will consider separately. His first contention is that during rebuttal, the prosecutor violated an evidentiary ruling from the court when he questioned Officer German about whether he was disciplined as a result of Harris's complaint of excessive force.

**A.** **Prosecutorial misconduct**

We begin with the well-settled law on prosecutorial misconduct. "A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202.)

"To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct. [Citation.]" (*People v. Price* (1991) 1 Cal.4th 324, 447; *People v. Silva* (2001) 25 Cal.4th 345, 373.)

As we will explain, defense counsel did not make prosecutorial misconduct objections or request admonitions to most of the instances which defendant now raises on appeal, and precludes his appellate claims of misconduct. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1000; *People v. Cain* (1995) 10 Cal.4th 1, 48.)

In the alternative, however, defendant claims counsel was prejudicially ineffective for failing to preserve the objections. We will thus examine the merits of defendant's

claim that the prosecutor violated the court's evidentiary ruling when it questioned Officer German about the investigation into Harris's complaint against him.

### B. Officer German's testimony

As explained above, defendant called Devonte Harris, another Corcoran inmate, to testify about his prior encounter with Officers German and Holguin. Harris claimed German used excessive force against him, and he filed a complaint about German's conduct.

In rebuttal, the prosecutor recalled Officer German to testify about the incident with Harris, and the subsequent complaint Harris filed against him. The prosecutor asked German what happened after the Harris complaint was filed "as far as your review." Defense counsel objected for hearsay. The court sustained the objection.

The prosecutor asked German whether he was reviewed and how that worked. German said he was investigated by Internal Affairs, he was interviewed, the inmate was interviewed, and "they kind of come up with a conclusion of what actually happened." The prosecutor asked what was the conclusion. Defense counsel again objected for relevance.

The court excused the jury and held the evidence was clearly relevant. Defense counsel raised a hearsay objection. The prosecutor replied the evidence was not being admitted for the truth of the matter, but Officer German had personal knowledge of being told the results of the investigation. The court replied that German could not "opine on what someone else thought about what happened," but he could testify about whether or not he was punished or disciplined.

After further discussion, the court held Officer German could testify that he was not disciplined, but he could not quote from the conclusions of the third party fact-finder.

Officer German returned to the stand and the prosecutor again asked him about the review process. German testified the investigation was conducted by an Internal Affair's panel. Defense counsel raised relevance and prejudice objections which were overruled.

18.

In response to the prosecutor's questions, German testified he was not reprimanded or punished in any way as a result of the incident with Harris, he did not lose pay, and he did not lose his job.

The prosecutor continued:

"Q. … As far as you know, in any way was any of your conduct in regards to that incident with inmate Harris considered out of line, as far as you know?

"A. No."

Defense counsel objected for hearsay. The court sustained the objection.

The prosecutor continued and asked the question "a different way," as to whether if did anything during the Harris incident "that was considered out of proper procedure, out of line .…" Defense counsel objected for hearsay. The court directed the prosecutor to continue. The prosecutor asked whether he was "made aware of that as an officer." German said, "Yes." Defense counsel again objected, and it was overruled.

Finally, the prosecutor asked German whether he received any type of reprimand or punishment for the incident with defendant. German said no.

### C. Analysis

"It is misconduct for a prosecutor to violate a court ruling by eliciting or attempting to elicit inadmissible evidence in violation of a court order. [Citation.]" (*People v. Crew* (2003) 31 Cal.4th 822, 839.) "Such misconduct is exacerbated if the prosecutor continues to attempt to elicit such evidence after defense counsel has objected. [Citation.]" (*People v. Smithey* (1999) 20 Cal.4th 936, 960.) If the prosecutor asks a question that is likely to elicit a reference to inadmissible evidence, the question may constitute "misconduct even if the prosecutor did not intend to elicit such a reference. [Citations.]" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1405.)

We first note that while defense counsel raised evidentiary objections to the prosecutor's questions to Officer German, he never claimed the prosecutor engaged in

misconduct when he asked German the questions about the review board in order to preserve a prosecutor misconduct objection on that point. (*People v. Cain*, *supra*, 10 Cal.4th at p. 48.)

In any event, the entirety of this sequence demonstrates the prosecutor did not violate the court's evidentiary ruling or attempt to elicit inadmissible evidence when he questioned Officer German about the administrative complaint. After defense counsel's initial hearsay objections, the court clarified the prosecutor could ask German if he was disciplined as a result of Harris's complaint since he had personal knowledge of that fact, but he could not testify about the conclusions of the review board. The prosecutor's subsequent questions to German attempted to comply with the court's ruling by focusing on German's personal knowledge of the results of the investigation. While his questions may have been inartful, the prosecutor focused the questions on German's personal knowledge of whether he was advised of the results of the review process and whether he was disciplined. The prosecutor did not commit misconduct because these were matters within German's personal knowledge.

## V.     Prosecutorial misconduct; Alleged vouching for Officer German

Defendant next contends that during closing argument, the prosecutor improperly "vouched" for the credibility of Officer German and relied on facts not in evidence to bolster his credibility. As we will explain, however, the prosecutor relied on admissible evidence when, during closing argument, he discussed German's credibility and the defense accusations against him.

### A.     Officer German's testimony

During his trial testimony, Officer German said he had been a correctional officer for almost 11 years, that he worked at Corcoran for the entire time, and that he still worked at Corcoran. Defense counsel asked German if he was upset when defendant used vulgar language and obscenities toward him. German said no, because he was "used to it."

Defense counsel also asked Officer German if he had ever "assaulted an inmate in which it wasn't warranted." The prosecutor's objection was overruled, and German replied no.

During his rebuttal testimony, Officer German testified he had to use different force options during his time as a floor officer, and he had kept his job for 11 years. German testified he would lose his job if he used pepper spray against an inmate without cause.

"Q. Would you want to put your job on the line, for instance in this case with [defendant], by just spraying him with your pepper spray when there's no reason outside the guidelines? Would you want to do that?

"A. No."

The prosecutor asked Officer German whether there had been any indication made to him that he did anything "out of line" regarding the incidents with defendant and Harris. German said no.

### B. Closing argument

In the course of closing argument, the prosecutor addressed the allegations of defendant and Harris against Officer German:

"Officer German has been a correctional officer for 11 years, there's no evidence of it. Give him some credit for his record that he has worked as a correctional officer for 11 years and everything about his behavior in this case and his testimony seemed professional and above board. And, you have to ask yourself why would he just spray an inmate just because he's annoyed with him, upset a little bit, the inmate said something that offended him. He's use[d] to hearing that, he's heard every curse word in the book over the last 11 years. Is it reasonable to believe that Officer German would do that? Just hall [*sic*] off and spray him? Well, it just doesn't make sense to believe that when you consider all of the circumstances.

Later in argument, the prosecutor returned to the allegations against Officer German.

"And, like I said, if he wanted to get at the defendant he wouldn't have done it like that. He's smarter than that. He's been working there for

11 years. He would know how to get at the defendant, if he wanted to, and not let anybody know about it and not get to this point where it's in front of all of us.

"When you look at, again, how the defense had tried to put the officers on trial. They brought in inmate Harris. What was he here for? Pretty much to dirty up the officers. But, I submit it didn't work. He didn't dirty up the officers because Officer German's conduct during that incident with inmate Harris was reviewed very thoroughly and he was cleared of all wrong doing. He was not punished, not reprimanded, not docked in pay, he didn't [lose] his job, obviously. So it was confirmed how he acted in that incident with inmate Harris was correct and above board and according to procedure. In a way, Officer German has already had his day in front of the review board or his day in court, if you will, because he was reviewed."

Defense counsel objected. The prosecutor replied Officer German's conduct was reviewed. The court overruled the objection. The prosecutor continued: "And, he was cleared of any wrongdoing." Defense counsel again objected and the court overruled him.

The prosecutor further argued:

"And you can rest assured that when officers don't follow the guidelines there's checks and balances out there. This isn't the only check and balance. The defense wants to turn this into the check and balance on these officers and tell them how to do their jobs and what to do or not to do. They have to do their jobs and when they don't do it right they get reviewed and there's [*sic*] consequences. So, all evidence in this case proves that the officers did their job correctly. I don't think you need to spend much time questioning their conduct."

Defense counsel did not object to this argument.

**C.     Analysis**

A prosecutor commits misconduct where he or she misstates or mischaracterizes the evidence or asserts facts not in evidence. (*People v. Osband* (1996) 13 Cal.4th 622, 698.) However, when a claim of prosecutorial misconduct " 'focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable

22.

fashion.' [Citations.] Moreover, prosecutors 'have wide latitude to discuss and draw inferences from the evidence at trial,' and whether 'the inferences the prosecutor draws are reasonable is for the jury to decide.' [Citation.]" (*People v. Cole*, *supra*, 33 Cal.4th at pp. 1202-1203.)

"A prosecutor may comment upon the credibility of witnesses based on facts contained in the record, and any reasonable inferences that can be drawn from them, but may not vouch for the credibility of a witness based on personal belief or by referring to evidence outside the record. [Citations.]" (*People v. Martinez* (2010) 47 Cal.4th 911, 958.) "Prosecutorial assurances, *based on the record,* regarding the apparent honesty or reliability of prosecution witnesses, cannot be characterized as improper 'vouching,' which usually involves an attempt to bolster a witness by reference to facts *outside* the record. [Citation.]" (*People v. Medina* (1995) 11 Cal.4th 694, 757, italics in original.)

As discussed in issue IV, *ante*, the prosecutor properly elicited Officer German's rebuttal testimony that he was investigated as a result of Harris's complaint, he was not reprimanded or disciplined, and he was not reprimanded or disciplined because of the incident with defendant. These were matters within German's personal knowledge. The prosecutor's closing argument regarding these aspects of German's testimony was appropriate and based on the inferences from the admissible evidence.

In addition, the prosecutor did not engage in misconduct or improperly "vouch" for Officer German when he addressed German's work history. The prosecutor relied on the above-quoted portions of German's trial testimony when he addressed the credibility of the allegations made against him by defendant and Harris. German testified about his employment at Corcoran, he had used force against other inmates during his work history, and he still worked at Corcoran. German further testified he was not upset about defendant's conduct that day, that he would lose his job if he used force without cause, and that he would not put his job on the line by using pepper spray in this instance.

23.

The prosecutor's argument about Officer German's work history, and the credibility of the defense allegations against him, was based on admissible evidence and did not amount to improper vouching.

## VI.     Prosecutorial misconduct; reasonable doubt

Defendant's final claim of prosecutorial misconduct is based on a portion of the prosecutor's closing argument where he allegedly misstated his burden of proving the charged offense beyond a reasonable doubt. As with his other allegations, defense counsel did not raise a prosecutorial misconduct objection or request an admonition. We thus turn to the merits based on defendant's alternate claim of ineffective assistance.

### A.     Background

The jury received the pattern instruction on reasonable doubt, CALCRIM No. 220, as follows.

> "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt.

> "In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty."

Defendant's claim of error is based on the following portion of the prosecutor's closing argument:

> "This mention of reasonable doubt, focus on that word 'reasonable.' You have to ask yourself, 'what is reasonable to believe and what is reasonable to doubt?' And, I know that we spent a lot of time trying to tell you and imploring you to believe the things that we want you to believe but you have to use your common sense. You had that with you before you came to court, I'm sure you still have it now; use that when you deliberate. What we say isn't evidence, it's just argument so use your common sense when deliberating and ask yourself about reasonable doubt and whether there is reasonable doubt in this case.

24.

"Remember the instruction that you have it says that reasonable doubt doesn't mean beyond all doubt it just means because everything in life is open to some possible doubt. It has to be beyond a reasonable doubt so don't forget that word 'reasonable.'

"*If you think you have some reasonable doubt I urge you to try to write it down. Try to write down what you think is reasonable doubt in this case. If you can't write anything down then I suggest that you don't have reasonable doubt.* And, if you do write something down look at what you wrote down and ask yourself if that has anything to do with punishment or bias or sympathy or prejudice; if it does then it's not reasonable doubt, those are things—areas you are not suppose to consider. But also ask yourself, if you write something down, if it is something that is factually important to you making your decision: Whether there's a little bit of [pepper] spray on his shoulders is that something that is pivotal in your goal as jurors in deciding this case? Ask yourself that, as well." (Italics added.)

## B.  Analysis

"It is improper for a prosecutor to misstate the law generally and, in particular, to attempt to lower the burden of proof. [Citation.]" (*People v. Williams* (2009) 170 Cal.App.4th 587, 635.) "[A] prosecutor may not suggest that 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.' [Citations.]" (*People v. Woods* (2006) 146 Cal.App.4th 106, 112-113.)

Defendant points to the italicized language above and argues the prosecutor misstated the law and effectively told the jury it had to find "articulable facts" for it to have reasonable doubt of defendant's guilt. We note the prosecutor did not use the phrase "articulable facts." (See, e.g., *People v. Thomas* (2012) 53 Cal.4th 771, 811-812 [rejecting claim that pattern instruction on reasonable doubt improperly required jury to "articulate" reasons for finding reasonable doubt]; *Butler v. South Carolina* (1982) 459 U.S. 932, 934-935 [jurors should not be told they must "articulate a 'real reason' " for doubt]; *Chalmers v. Mitchell* (2d Cir. 1996) 73 F.3d 1262, 1268 [instruction cannot tell the jurors they must be ready to articulate a reason for their doubts because "the jury might believe it should look to the defendant to articulate the reason for the doubt, in essence requiring him to prove his innocence"].)

As we have already noted, however, defense counsel did not object to this portion of closing argument, and any misstatement could have been cured with an appropriate admonition. (*People v. Hinton* (2006) 37 Cal.4th 839, 863.) As for his alternative claim of ineffective assistance, we find defense counsel's failure to object was not prejudicial. The trial court instructed with CALCRIM No. 220 on the prosecution's burden of proof beyond a reasonable doubt. The court also gave CALCRIM No. 200, which admonished the jurors that "[y]ou must follow the law as I explain it to you, even if you disagree with it. [*I]f you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions.*" (Italics added.) The jury was correctly instructed on the applicable reasonable doubt burden of proof and that the court's instructions superseded any conflicting argument on the law by the prosecutor. We presume the jury followed the trial court's instructions without any indication to the contrary, and conclude the jury applied the correct reasonable doubt burden of proof, ignoring the prosecutor's closing argument misstating that burden. (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17; *People v. Prince* (2007) 40 Cal.4th 1179, 1295.)

Finally, based on the record in this case, we conclude defendant was not denied a fundamentally fair trial because of the prosecutor's closing argument on this point. Accordingly, we do not apply the *Chapman*[2] standard of prejudicial error (i.e., harmless beyond a reasonable doubt) for federal Constitutional violations. (*People v. Castillo* (2008) 168 Cal.App.4th 364, 386-387, fn. 9; *People v. Bordelon* (2008) 162 Cal.App.4th 1311, 1323-1324.)

## VII. Defendant's third strike term

Defendant contends this court must vacate his third strike sentence and modify his sentence to a third strike term based on the amendment of the third strike provisions by Proposition 36. As this court explained in *People v. Yearwood* (2013) 213 Cal.App.4th

---

[2] *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*).

161, however, defendant's appropriate recourse is to petition for a recall of sentence in the trial court pursuant to section 1170.126, the provision added by Proposition 36. He is not entitled to a remand for resentencing on appeal under the amendments to sections 667 and 1170.12. (*Yearwood, supra,* 213 Cal.App.4th at pp. 171-172, 176.)

## DISPOSITION

The judgment is affirmed.

_____
Poochigian, Acting P.J.

WE CONCUR:


_____
Detjen, J.


_____
Peña, J.