Filed 1/30/15  P. v. Houts CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E060242 |
| v. | (Super.Ct.No. BAF1300513) |
| WILLIAM HOWARD HOUTS, JR., | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Irma Poole Asberry, Judge.  Affirmed.

Law Offices of John F. Schuck and John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Peter Quon, Jr. and Martin E. Doyle, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant William Howard Houts, Jr. shoplifted from a Walmart. After he left the store, Walmart employees confronted him, but he threatened them with a knife. When the police arrested him, he refused to obey their commands.

After a jury trial, defendant was found guilty of second degree robbery (Pen. Code, §§ 211, 212.5, subd. (c)), with an enhancement for the personal use of a deadly weapon (Pen. Code, § 12022, subd. (b)), and of resisting a peace officer (Pen. Code, § 148, subd. (a)(1)). He was sentenced to eight years in prison, which included four one-year prior prison term enhancements (Pen. Code, § 667.5, subd. (b)).

Defendant now contends:

1. The introduction of evidence of defendant's beliefs about "White pride" violated his right to due process and a fair trial.

2. The trial court erred by allowing the prosecution to impeach defendant with an excessive number of prior felony convictions.

3. One of the four prior prison term enhancements was factually untrue.

We find no error. Accordingly, we will affirm.

## I

## FACTUAL BACKGROUND

On July 27, 2013, around 6:00 p.m., while defendant was in a Walmart in Beaumont, he was spotted putting a water filter and a roll of wire into the waistband of his shorts. He then left the store without paying.

Three Walmart asset protection employees — Moises Tavira, who was Hispanic, and Joshua Coleman and Brandon Keith, who were Black — followed him out.

Coleman approached defendant, identified himself as Walmart security, and showed him his badge. He said to give back the merchandise and to come back inside.

Defendant pulled a knife. He pointed the knife at Coleman and said, "You guys need to back up." Both Coleman and Tavira called the police and reported that defendant had pulled a knife on them.

Meanwhile, defendant walked away through the parking lot; Coleman and Tavira followed him. He pulled out the knife two more times, saying "You need to stop following me" and "You need to back up." At one point, defendant tripped and fell.

Defendant called Coleman "the 'N' word." He also threatened to have his skinhead friends "come [and] get" Coleman. He took off his shirt, revealing tattoos "[a]ll over" his body.

As police officers arrived, defendant ran into a nearby Taco Bell. The officers went inside and found him in the ladies' room. He was inside the only stall, with the door shut, standing on top of the toilet and flushing it. He did not comply with the officers' commands. They had to force him to the ground; they also had to use force to pull his hands out from under him and behind his back so they could handcuff him. In the toilet, the police found a knife. Coleman identified it as the knife that defendant had brandished.

3

Defendant testified on his own behalf. He admitted stealing the two items. He explained that he needed them as materials for "an installation job on somebody's kitchen," but he did not have enough money to buy both of them. He also admitted having a knife, but he denied pulling it out at any point.

After he fell, defendant testified, his lip was bleeding. He took off his shirt to use it to stanch the bleeding, not to intimidate anyone with his tattoos.

Defendant denied using the N word. He admitted having tattoos that said "white pride," "Thank God I'm white," and "1488." "1488" referred to the 14 words and the 88 precepts, which were expressions of white pride. Defendant claimed that, ten years earlier, he "gave up that and turned my life over to God . . . ." However, he admittedly still believed "that my own race should stay pure."

As of July 27, 2013, defendant was on postrelease supervision, so he was not supposed to possess a weapon. That was why he ran from the police and why he tried to flush the knife down the toilet. When the police questioned him, he falsely denied having had a knife, because he thought he had successfully gotten rid of it. He denied resisting the officers.

II

EVIDENCE OF DEFENDANT'S WHITE SUPREMACIST BELIEFS

Defendant contends that the introduction of evidence of the White supremacist beliefs related to his tattoos violated his right to due process and a fair trial.

4

A.    *Additional Factual and Procedural Background.*

As mentioned, Coleman testified that defendant called him "the 'N' word" and threatened to "call[] his skinhead friends[.]"  Coleman also testified that defendant took off his shirt, revealing his tattoos.

Defendant denied calling Coleman the N word.  When asked if he would use that word, he replied, "No.  And I don't discriminate against other people and their ethnicity or anything like that.  I am who I am.  I have my, you know, my own beliefs in Christianity, but I don't discriminate another man [*sic*], try to be biased in any way."

Defendant also denied being a skinhead or threatening to call other skinheads.  He testified that he cut his mouth when he fell, and he took off his shirt so he could put it on his mouth.

On direct examination, in response to questions by his own counsel, defendant testified that he had tattoos reading "white pride," "14," "88," and "Thank God I'm white."  He explained that "14" meant the 14 words, which were, "We must secure the existence of our people and the future for white children."  "88" meant the 88 precepts.  These tattoos reflected his "[p]ersonal beliefs."  They did not "indicate any sort of militan[ce] or violence towards other races[.]"

On cross-examination, the prosecutor asked:

"Q  And 88 actually stands for 8 is — H is the 8th number — the 8th letter in the alphabet; correct?  So it actually stands for H-H, which stands for hail Hitler; isn't that what it means?

5

"A  It depends on what the person's preference is.  Some people use it as that.  Some people use it as 88 precepts.  But, in reality, it's 88 precepts. . . .

"Q  And, in reality, 88 also means hail Hitler; right?

"A  No.

"Q  Didn't you just say it did —

"A  I said —

"Q  — in some people's books?

"A  — some people's preference.  To me, no.

"Q  And so what you're saying is that when you have — you have the tattoo, that 1488.  Right?

"A  I actually have a '14' and an 'S' and an 'S' on my back.

"Q  It's not supposed to stand for 1488?

"A  You tell me.  You're the one — I don't know.  I just explained what the 14 words were."

The prosecutor also asked:

"Q  So with these tattoos that you have, right, these all basically have to do with white power stuff, right?

"A  White pride.  There's a difference."

She further asked:

"Q  . . . [C]an you tell us again what those 14 words were?

"A  We must secure the existence of our people in a [*sic*] future for white children.

"Q  And who wrote those 14 words?

"[DEFENSE COUNSEL]:  Objection, your Honor.  Relevance.

"THE COURT:  Overruled.

"THE WITNESS:  Umm, I can't — I don't know.  If I gave you a 'yes' or 'no' answer, I would — wouldn't be giving the proper answer.  I don't have an answer for that.

"Q  BY [THE PROSECUTOR]:  Were those 14 words written by a Nazi leader, David Lane, spelled L-a-n-e?

"[DEFENSE COUNSEL]:  Objection.  Relevance, and counsel is testifying.

"THE COURT:  Overruled as to defense (sic) is testifying.  Overruled as to relevance.

"THE WITNESS:  Umm, I can't give you a direct answer on that.

"Q  BY [THE PROSECUTOR]:  And the other part of the 1488 that's tattooed on your back, was the 88 part; right?

"A  Yes.  [¶]  . . .  [¶]

"Q  And you were telling the jury . . . that the 88 does not stand for H-H or Hail Hitler?

"A  Yes, I did say it did not stand for that.  88 is a precept, what you're explaining is H-H, those are two separate numbers in itself.  H-H.  8-8.  So they are not in sync with each other.  88 is a different preference (sic) to 88.

"Q  But you have the '14' and the '88' across your back?

7

"[DEFENSE COUNSEL]: Objection, your Honor. Asked and answered.

"THE COURT: Sustained.

"Q BY [THE PROSECUTOR]: And so you said . . . that the 88 stood for 88 precepts; right?

"A Yes

"Q And so the 88 precepts are basically 88 points in one document; correct?

"A Yes.

"Q And because you believe in that, I'm sure you know what all the 88 precepts are; correct?

"A I don't have a direct answer.

"Q Are you familiar with the content that's located within those 88 precepts?

"A Not all of them directly, no.

"Q But the gist of the 88 precepts, the information contained within there, talks about how the white race is better than other races?

"A Actually I gave up that and turned my life over to God about ten years ago so I can't really give you an answer on that."

B.      *Analysis*.

Defense counsel, on direct examination, elicited evidence about defendant's tattoos and their meanings. Defendant does not claim that this constituted ineffective assistance. Thus, defendant cannot complain about the admission of this evidence. (*People v. Williams* (2009) 170 Cal.App.4th 587, 620 [Fourth Dist., Div. Two].)

8

In addition, when the prosecutor, on cross-examination, elicited additional evidence about defendant's tattoos and beliefs, defense counsel by and large did not object. Thus, any error in admitting this evidence is not reversible. (Evid. Code, § 353, subd. (a).) Defendant argues that, even in the absence of an objection, an appellate court can reverse a conviction where "an unfairness so gross has occurred as to deprive defendant of due process of law," citing *People v. Burns* (1969) 270 Cal.App.2d 238, 252 and *People v. Chambers* (1964) 231 Cal.App.2d 23, 28. *Burns* and *Chambers*, however, both involved the failure to object to *consolidation of trial*; they did not involve the failure to object to *evidence*, which is governed by Evidence Code section 353. In any event, our Supreme Court has held that failure to object to evidence forfeits a claim that the admission of the evidence violates due process. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1240, fn. 2; see also *People v. Partida* (2005) 37 Cal.4th 428, 435-436.)

At least some evidence about defendant's beliefs was relevant to corroborate Coleman's testimony and to disprove defendant's denials of that testimony. Moreover, as the prosecutor argued in closing, at least some evidence about defendant's tattoos was relevant to show that taking off his shirt was an intimidating gesture, and thus to show that he committed robbery by fear, if not by force. Defense counsel could reasonably choose to "draw the sting" of this evidence by asking about it on direct. Moreover, the prosecutor could properly cross-examine defendant about it. Because defense counsel failed to object, we have no occasion to determine whether the prosecutor's questions went beyond appropriate limits.

There were only two instances in which defense counsel did object and in which the trial court also overruled the objection. They both had to do with whether David Lane wrote the 14 words. Both times, defendant said he could not answer the question. Assuming, without deciding, that the trial court erred by overruling these objections, defendant's answers clearly were not prejudicial — particularly in light of the evidence of his beliefs that his own counsel had already introduced.

III

ADMISSION OF PRIOR CONVICTIONS FOR IMPEACHMENT PURPOSES

Defendant contends that the trial court erred by allowing the prosecution to impeach him with as many prior felony convictions as it did.

A. *Additional Factual and Procedural Background*.

The prosecution proposed to impeach defendant with 12 prior convictions:

1994: Burglary, a felony (Pen. Code, § 459), and falsely identifying oneself to a peace officer, a misdemeanor (Pen. Code, § 148.9, subd. (a)).

2000: Possession of a forged check with the intent to defraud, a felony (Pen. Code, § 475, subd. (c)).

2002: Unlawful taking or driving of a vehicle, a felony (Veh. Code, § 10851, subd. (a)).

2003: Grand theft, a felony (Pen. Code, § 487, subd. (a)) and unlawful taking or driving of a vehicle, a felony.

2005: Receiving stolen property, a felony (Pen. Code, § 496, subd. (a)).

10

2008:  Four counts of unlawful use of personal identifying information, a felony (Pen. Code, § 530.5, subd. (a)).

2010:  Receiving a stolen motor vehicle, a felony (Pen. Code, § 496d, subd. (a).[1]

Defense counsel filed a written motion in limine to exclude evidence of defendant's prior convictions as irrelevant and as more prejudicial than probative.

At the hearing on motions in limine, defense counsel asked the trial court to admit only the 2005, 2008, and 2010 convictions; he argued that the earlier convictions were remote and unduly prejudicial.

The trial court excluded evidence of the two 1994 convictions, because defendant had been a juvenile at the time.  However, it overruled defendant's objections to the other ten convictions.[2]  It noted, "[T]here is not one that is more than two years apart from the other.  They happen very frequently.  There are many. . . .  [T]here's sufficient connection between the dates . . . to find that remoteness is not a reason for their exclusion."

---

[1]  Defendant also had four prior convictions for possession of a controlled substance.  (Health & Saf. Code, § 11377, subd. (a).)  The prosecution did not try to admit these, as they are not crimes of moral turpitude.  (See *People v. Castro* (1985) 38 Cal.3d 301, 317.)

[2]  Defendant seems to think only six convictions were admitted.  There were six conviction *dates* (2000, 2002, 2003, 2005, 2008, and 2010).  In 2003, however, he had been convicted of two distinct offenses.  Similarly, in 2008, he had been convicted on four counts of the same offense.  Thus, the trial court actually admitted a total of ten convictions.

Accordingly, defense counsel preemptively introduced evidence of these ten convictions. The prosecutor also cross-examined defendant about them.

The trial court instructed the jury: "If you find that a witness has been convicted of a felony, you may consider that fact only in evaluating the credibility of the witness' testimony. The fact of a conviction does not necessarily destroy or impair a witness' credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable." (CALCRIM No. 316.)

In closing argument, the prosecutor stated: "I am not getting up here and saying, oh, he's been convicted of a felony before so you should find him guilty now. That's not what this is about. The fact that he has been convicted of a felony that involves theft, which involves moral turpitude, that's for you in deciding whether or not he's a credible person. He was convicted of nine [*sic*] theft-related crimes — felonies between 2000 and 2010. He is the witness who has the — those convictions. He is the witness who's not credible."

B.     *Analysis.*

"Evidence of a prior conviction is admissible in a criminal case, subject to the limitations of Evidence Code section 352, so long as the conviction involves moral turpitude. [Citation.]" (*People v. Robinson* (2011) 199 Cal.App.4th 707, 712, fn. omitted.)

"'When determining whether to admit a prior conviction for impeachment purposes, the court should consider, among other factors, whether it reflects on the

12

witness's honesty or veracity, whether it is near or remote in time, whether it is for the same or similar conduct as the charged offense, and what effect its admission would have on the defendant's decision to testify.' [Citation.]" (*People v. Edwards* (2013) 57 Cal.4th 658, 722.)

"Because the court's discretion to admit or exclude impeachment evidence 'is as broad as necessary to deal with the great variety of factual situations in which the issue arises' [citation], a reviewing court ordinarily will uphold the trial court's exercise of discretion. [Citations.]" (*People v. Clark* (2011) 52 Cal.4th 856, 932.)

Defendant does not dispute the fact that all of the admitted priors involved moral turpitude. He does argue that the 2000, 2002, and 2003 convictions were remote. "However, convictions remote in time are not automatically inadmissible for impeachment purposes. Even a fairly remote prior conviction is admissible if the defendant has not led a legally blameless life since the time of the remote prior. [Citations.]" (*People v. Mendoza* (2000) 78 Cal.App.4th 918, 925-926 [Fourth Dist., Div. Two].) Here, the prosecution was entitled to show that defendant persistently kept committing crimes of moral turpitude. "[A] series of relevant crimes is more probative of credibility than a single lapse. [Citation.]" (*People v. Hinton* (2006) 37 Cal.4th 839, 888.) "'. . . No witness including a defendant who elects to testify in his own behalf is entitled to a false aura of veracity." (*People v. Turner* (1994) 8 Cal.4th 137, 201.)

Defendant also argues that the priors were theft-related and thus unduly similar to the charged robbery. However, none of them was actually for robbery. Defendant

13

admitted deliberately stealing the items from the Walmart; he simply denied doing so by force or with the use of a knife. Thus, the fact that the priors were theft-related did not unduly prejudice his defense. In fact, his attorney turned the priors to his advantage in closing argument, by arguing that they were all nonviolent and that defendant had demonstrated honesty by admitting them. In any event, "'[a]lthough the similarity between the prior convictions and the charged offenses is a factor for the court to consider when balancing probative value against prejudice, it is not dispositive.' [Citation.]" (*People v. Edwards*, *supra*, 57 Cal.4th at p. 722.)

Finally, the trial court gave a limiting instruction. Consistent with the limiting instruction, the prosecutor urged the jury to consider the priors solely as evidence of defendant's lack of credibility, and not as evidence of his guilt. "'Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions. [Citations.]' [Citation.] We presume that the jury did not use the evidence as propensity evidence." (*People v. Little* (2012) 206 Cal.App.4th 1364, 1381.)

For these reasons, we conclude that the trial court did not err by admitting the ten prior convictions.

IV

THE TRUTH OF ONE OF THE PRIOR PRISON TERM ENHANCEMENTS

Defendant contends that one of the four prior prison term enhancements was factually untrue.

14

A.     *Additional Factual and Procedural Background.*

The information alleged five prior prison term enhancements, based on convictions in 2000, 2003, 2010, 2012, and 2013.  As already mentioned, defendant admitted all five.

The probation report listed all of defendant's prior convictions, including the five prior convictions underlying these alleged enhancements.  In particular, it indicated that, in 2012, he was convicted of simple possession of a controlled substance (Health & Saf. Code, § 11377, subd. (a)), as a felony, and sentenced to 16 months of mandatory supervision.  It also indicated that, in 2013, he was convicted of simple possession of a controlled substance, as a misdemeanor, and sentenced to 90 days in jail, to be served concurrently with the term for the 2012 conviction.

The probation report also noted that five enhancements had been found true.  It added, however, that according to the prosecutor, the 2013 enhancement "was alleged in error, as the offense [was] a misdemeanor and not a felony."

At sentencing, the prosecutor moved to dismiss the 2012 enhancement, as "a duplicate of the 2013."  Defense counsel asserted that, according to the probation report, "the conviction from . . . 2013 was actually a misdemeanor, and that would be the invalid one."  The prosecutor asserted again that the 2012 enhancement was the one that should be dismissed.  Defense counsel responded, "I'll submit."

The trial court dismissed the 2012 enhancement.  Thus, it imposed four enhancements, including the 2013 enhancement.

15

B.    *Analysis.*

Defendant claims that the record shows that the 2013 enhancement was invalid because it was based on a misdemeanor conviction.

The problem is that defendant admitted this enhancement. Indeed, he specifically admitted, in open court, that it was a based on a felony conviction. "'A guilty plea admits every element of the charged offense and constitutes a conviction [citations], and consequently issues that concern the determination of guilt or innocence are not cognizable [on appeal]. [Citations.]' [Citation.] Thus, a guilty plea waives any right to raise questions regarding the evidence, including its sufficiency or admissibility. [Citation.]" (*People v. Zuniga* (2014) 225 Cal.App.4th 1178, 1186-1187 [Fourth Dist., Div. Two], fn. omitted.) In this respect, "'[a]dmissions of enhancements are subject to the same principles as guilty pleas.' [Citation.]" (*People v. Westbrook* (1996) 43 Cal.App.4th 220, 224.) Accordingly, defendant cannot challenge the sufficiency of the evidence underlying this admission in this appeal.

Defendant's admission alone is sufficient evidence that the enhancement is true. As the People point out, it is conceivable that the probation report is incorrect. Curiously, the probation officer claimed to be relying on information from the prosecutor; at sentencing, however, the prosecutor took a very different position. If defendant had not admitted the enhancement, the People would have had to prove it up, using primary documents (such as minute orders and abstracts of judgment) rather than the probation report. Because he did admit it, however, these materials are not in the record.

16

Defendant is not without a remedy.  If the facts are as he claims they are, he should be entitled to relief by way of a petition for writ of habeas corpus based on factual innocence and/or ineffective assistance of counsel.  We conclude, however, that he is not entitled to any relief in this appeal.

V

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ
P. J.

We concur:

McKINSTER
J.

MILLER
J.

17