Filed 1/19/22  P. v. Moore CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H046446 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. C1364062) |
| v. | |
| SHAUN ALEXANDER MOORE, | |
| Defendant and Appellant. | |

A jury rejected defendant's self-defense claim, and convicted him of first degree murder for killing Ramon Garcia.  Defendant argues that trial counsel rendered ineffective assistance by not objecting during defendant's cross-examination to questions eliciting that he violated court orders by taking possession of the gun used to kill Garcia just before shooting him.  He also argues the prosecutor committed prejudicial misconduct during defendant's cross-examination by posing a series of argumentative and speculative questions, and during closing argument by misstating the law on heat of passion voluntary manslaughter.  He further asserts that his prior conviction for active participation in a criminal street gang was not shown to be a prior serious felony or strike offense.

Defendant's prosecutorial misconduct claims are forfeited to the extent he neither objected to the questions and argument nor sought a jury admonition.  As we find no prejudice from any prosecutorial error during cross-examination or closing argument, we reject defendant's ineffective assistance claims.

We agree that the abstract of judgment used to prove defendant's prior conviction for active participation in a criminal street gang does not establish the elements of the offense necessary to qualify the conviction as a prior serious felony and strike offense. We will therefore reverse the true finding and remand the matter to retry the prior serious felony and prior strike allegations.

## I.  BACKGROUND

Defendant fatally shot Ramon Garcia in August 2013 in a parking lot near downtown San Jose.  He was charged with murder with the personal use of a firearm (Pen. Code, §§ 187, subd. (a), 12022.53, subd. (d).)  The information alleged a prior strike conviction (Pen. Code, §§ 667, subds (b)–(i), 1170.12) and a prior serious felony conviction (Pen. Code, § 667, subd. (a)).  Trial was held in 2018.

The prosecution called several percipient witnesses at trial:  From his second story apartment on 3rd Street, one witness heard an escalating commotion and saw "a group of guys against one individual."  An African American man wielded a bat at a Hispanic man who was "backing up" and being followed, and the others looked like they were "containing" the Hispanic man.  The African American man swung the bat at the Hispanic man.  The Hispanic man fell, held up his forearms to defend against the bat, and struggled to get up.  He turned his back, and moved away from the man with the bat and from the witness's view.

From a yard sale on the corner of 3rd and Julian, a woman heard a noisy group of men approaching on the street.  As the group got closer, an African American male hit a man on a bicycle with a large stick.  The man fell, was hit again, and started to bleed.

From his westbound car stopped at the traffic light at Julian and 3rd, a man saw a group of four or five African American males running on 3rd toward Julian.  The group was led by two men, one of whom carried a large wooden stick.  The group arrived at Julian just as a Mercedes pulled up.  The man with the stick approached the Mercedes, was handed a gun, and ran east on Julian.  The other man who led the group remained at

2

the corner and yelled " 'yeah, yeah, yeah' " as the witness heard shots being fired. The group appeared to be chasing a Hispanic male on a bicycle. The passenger in the same car saw the Mercedes pull up and observed people on the sidewalk. Someone grabbed something from the car and "speed walk[ed]" toward a nearby taqueria. She turned around and saw the person fire a gun, a man on a bicycle fall, and other people scatter.

A man who lived across the street from the taqueria parking lot witnessed the shooting from his driveway. A Hispanic man rode up on a bicycle followed by an African American male on foot. The Hispanic man jumped off the bike as he turned into the parking lot, raised his hands "almost like he was being arrested," and said " 'you got me. You got me.' " The African American man fired at the Hispanic man three times, and ran down 4th Street. Another man heard shots fired, saw an African American man run south on 4th Street, discard what looked like a baseball bat in an abandoned lot, and hand what looked like a gun to a someone on a bike.

Defendant testified that Garcia approached his friends Clompton and Kemp in St. James Park looking for drugs. Garcia took offense when defendant said something like " 'You all in my boy's face.' " Defendant did not know Garcia, who appeared high, but he apologized to Garcia, they "tapped" fists, and Garcia walked away. Garcia returned a few minutes later with two men on bicycles. Defendant thought one of the men had a gun because of the way he was touching his pants. Garcia said he felt disrespected and wanted to "take it down the street" to fight. Defendant agreed because he wanted to "get the threat away" from the children at the park, including his seven-month-old son. A small group, including defendant, Garcia, Garcia's two companions, and Clompton, proceeded to walk away from the park.

Defendant testified that he alone followed Garcia to a carport behind an apartment complex, where Garcia struck defendant's mouth with his fist. Defendant struck back, avoided a second blow, and slipped. Garcia struck defendant's lip with a shiny object which defendant thought was a knife. Defendant was unarmed, scared, and told Garcia

3

he did not want to fight. Garcia held the shiny object which looked like an awl or screwdriver, motioned defendant to "come on," and defendant thought Garcia was going to stab him. Garcia swung again, defendant got "out of the way," but felt "a little pinch" in his side. As defendant ran toward the street where the onlookers remained, he felt a slash on his back and thought it was from a knife. As he walked toward the park, he saw an axe handle on the ground and picked it up. He did not want to fight, but the onlookers were egging on both sides.

Defendant described that Garcia and the others followed him past the park, and on the next corner (3rd and Julian) defendant struck Garcia, who " 'was coming at' " him, on the shoulder with the axe handle. Defendant was scared because "nothing [was] going to stop" Garcia. Defendant swung the axe handle a second time, striking Garcia above the ear. Garcia fell, but "bounced right back up" just as defendant heard someone calling his name. Defendant turned and saw his friend Demo gesturing from a car. Defendant ran to Demo, who handed him a gun. Garcia jumped on his friend's bike, and defendant pursued him on foot. Garcia peddled less than a block before turning into a parking lot and stepping off the bike. Garcia was holding an awl when defendant "got up close to him [and] shot him." Garcia "went down," but he "got back up and motioned like he was going to swing the object again," and defendant "shot again."

Several 911 calls were admitted in evidence, in addition to the axe handle, and a video of the shooting captured on a home surveillance camera. Garcia's DNA was found on the handle and tip of an awl that was recovered from the parking lot. Defendant's DNA was not detected on the awl.

Defendant testified that he used someone else's name and a made-up social security number at the emergency room later that day, where he received sutures on his lip. He testified that he borrowed a car from someone he knew for a "couple hundred dollars," drove to San Francisco and threw the gun off the Golden Gate Bridge, before he

4

went to the emergency room. Within weeks, he went to Las Vegas where he shaved his dreadlocks.

Clompton, whom defendant described as a "good friend" who would regularly "hang out with [defendant] and [defendant's wife]," testified that a man on a bicycle approached him in the park about "smoking weed." The man, who "came off wrong, the way he act[ed]," approached others, left the park, returned with someone else, and approached a table in the park "like in conversation." Then "everybody got up and left down the street," and it looked like there was going to be a fight. Clompton testified that he followed the group to the edge of the park, where he heard a loud commotion, "and a black guy came out, it looked like he was bleeding and it looked like he was trying to get away." Clompton could no longer see the group once they reached Julian Street. He testified on cross-examination that he did not know defendant, he had seen defendant twice before "around the park," but he did not know or remember what defendant's face looked like.

A toxicology report showed that Garcia was under the influence of alcohol and methamphetamine when he died. A psychiatrist testified regarding persons under the influence of alcohol and methamphetamine. He explained that "anyone who is intoxicated on alcohol and methamphetamine is at a higher risk of behaving violently." But he went on to state that "a [] male riding a bicycle and then being randomly assaulted from behind" does not describe violent behavior.

The jury was instructed on first degree murder, first or second degree murder with malice aforethought, justifiable homicide (self-defense), heat of passion voluntary manslaughter, and imperfect self-defense voluntary manslaughter. Defendant argued that he acted in self-defense to protect himself from a violent erratic man who had attacked him with an awl. The prosecutor argued that taking the gun from Demo and pursuing and shooting a retreating victim multiple times showed premeditation; there was no credible evidence of self-defense; and it defied logic that defendant would pursue Garcia, who

5

was carrying an awl, when at the same time he was afraid of one of Garcia's associates who he believed was armed with a gun.

The jury found defendant guilty of first degree murder and found the firearm enhancement to be true. The court found true the prior strike and serious felony allegations. Defendant was sentenced to 80 years to life, composed of three 25-years-to-life terms (for murder, the prior strike, and the firearm enhancement), and five years for the prior serious felony conviction.

## II. DISCUSSION

### A. INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM

Defendant argues that trial counsel rendered ineffective assistance by failing to object on relevance and Evidence Code section 352 grounds to the prosecutor's questions regarding defendant's violation of court orders. An ineffective assistance claim requires a showing both that counsel's performance fell below an objective standard of reasonableness and that defendant was prejudiced by the deficient performance. (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) "Unless a defendant establishes the contrary, we shall presume that 'counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy.' " (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.) If the record on appeal "sheds no light on why counsel acted or failed to act in the manner challenged, 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation' [citation], the case is affirmed." (*People v. Babbitt* (1988) 45 Cal.3d 660, 707.) To prove prejudice, a defendant must affirmatively show a reasonable probability of a more favorable result but for trial counsel's errors. (*Ledesma*, at p. 746.) A reasonable probability is "a probability sufficient to undermine confidence in the outcome." (*People v. Williams* (1997) 16 Cal.4th 153, 215.)

The prosecutor moved in limine to impeach defendant with prior convictions involving moral turpitude. The motion identified 12 convictions between 1998 and 2013,

6

most involving possessing drugs for sale. In chambers, the prosecutor limited its request to three convictions: selling narcotics in 2010 (Health & Saf. Code, § 11352); possessing drugs for sale in 2006 (Health & Saf. Code, § 11351); and possessing a firearm as a felon in 2004 (Pen. Code, § 12021). The trial court ruled the three convictions admissible as impeachment evidence. Defendant did not object to the ruling.

Defendant admitted the prior convictions on direct examination. The prosecutor elicited on cross-examination that at the time Demo handed him the gun, defendant knew he had been convicted of drug dealing and possessing a gun as felon; knew he was not supposed to handle a gun; and decided to take the gun even though he had been ordered not to have one. In further cross-examination, the prosecutor elicited that defendant "definitely knew that [he] [was] not supposed to be a felon in possession" at the time he was convicted of possessing a firearm as a felon; the court had ordered him "not [to] have any firearms for the rest of [his] life"; and he "disobeyed that order."

Defendant argues trial counsel should have objected to the prosecutor's questions because a felon's use of a gun in self-defense is not unlawful under *People v. King* (1978) 22 Cal.3d 12, 23 (holding Penal Code former section 12021, prohibiting a felon from possessing a concealable firearm, does not restrict a felon's use of a concealable firearm in self-defense). Defendant posits that the admissions were not relevant to his credibility or to whether he was acting in self-defense; trial counsel should have objected so that the jury would not infer he was disposed to violence and less likely to be credible because he possessed a gun in *this* case.

Defendant argues he was prejudiced by counsel's failure to object because the prosecution's case depended on defendant's credibility, and evidence that he "possess[ed] a gun illegally and against a court order provided necessary ammunition to the argument that he should not be believed." In defendant's view, the case was close because no witness saw how the incident started, and there was no evidence that he knew Garcia, planned to kill Garcia, or had motive to kill Garcia. The trial court instructed the jury

7

with CALCRIM No. 226 that a witness's credibility can be judged by, among other things, whether "the witness [has] been convicted of a felony" and whether "the witness [has] engaged in other conduct that reflects on his or her believability." Defendant contends he was deprived of a fair trial because the instruction on witness credibility, combined with the prosecutor's closing argument that "[h]e was ordered by the Court to say the truth, but he's disobeyed prior court orders," permitted the jury to make an adverse credibility finding.

The Attorney General argues that no deficient performance occurred because defendant objected to the prior conviction pre-trial, and those objections continued through trial. Indeed, defendant objected in limine to impeaching with *undisclosed* prior convictions, but not with moral turpitude convictions generally, and he admitted the felon in possession conviction on direct examination. He also objected to using the *record* of a conviction or a no contest plea to impeach, and to prior bad act evidence under Evidence Code section 1101, subdivision (b) without a ruling outside the jury's presence. The asserted error defendant complains of here is different. He asserts error as to the questions eliciting that he "knew [he was] not supposed to handle a gun" when he took it from Demo, he "knew he was 'not supposed to be a felon in possession,' " and he "knew [he] "disobeyed a court order by possessing the gun." Defendant's in limine motions did not encompass those issues.

To the extent trial counsel should have objected to questions about defendant acting unlawfully and contrary to a court order by taking the gun from Demo to defend himself, the resulting testimony was not prejudicial. Defendant's credibility was properly impeached with the three moral turpitude felony convictions, including the conviction in 2004 for unlawfully possessing a firearm. (*People v. Robinson* (2011) 199 Cal.App.4th 707, 713 ["possession of a firearm by a felon is a crime of moral turpitude, as it denotes a 'readiness to do evil' "].) Defendant's credibility was also challenged by evidence of his providing a false name to Kaiser and fleeing to Nevada

8

where he changed his appearance. But more importantly, defendant's culpability does not rest on his credibility, as he argues. The prosecution's witnesses testified that defendant beat Garcia with the axe handle, and Garcia acted defensively up to and at the time he was shot. For the jury to accept defendant's version of events, it would have to find six independent percipient witnesses not credible.

Nor do the jury's questions during deliberations demonstrate that the case was close as to self-defense or manslaughter. The jury requested readback of defendant's testimony, the testimony of the witness who saw the group on 3rd Street from his second story window, and the testimony of the witness who observed defendant after the shooting. Those requests do not reveal the jury's deliberative process. The jury also asked the court whether the definition of "deliberate" in CALCRIM No. 521 (defining "deliberately" for purposes of first degree murder) applied to the term in CALCRIM No. 520 (elements of implied malice for second degree murder) and to "expand on the definitions in 521 (especially [the] 2nd paragraph)."[1] That question indicates that the jury was carefully considering first and second degree murder.

## B.    PROSECUTORIAL MISCONDUCT CLAIMS

Defendant argues the prosecutor committed misconduct in cross-examination and in arguing the law on heat of passion voluntary manslaughter. As a general rule, " ' "[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety." ' " (*People v. Centeno* (2014) 60 Cal.4th 659, 674.) During defendant's cross-examination, counsel

---

[1] The second paragraph of CALCRIM No. 521 instructs: "The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time."

9

objected to several questions as either argumentative or calling for speculation.  But he did not make all possible objections to the questions and argument he now challenges, and he did not request an admonishment.  Defendant has failed to show that further objection would have been futile or that any harm caused by the asserted misconduct would not have been cured with an admonition.  Defendant has therefore forfeited his misconduct claims.  He argues in the alternative that trial counsel was ineffective for failing to properly object to the asserted misconduct, which we now address.

### 1.  Lack of Objection During Cross-Examination

Defendant testified on direct examination that Garcia took offense to the remarks he made in the park; Garcia challenged him to a fight; a crowd followed but remained on the street when Garcia and defendant entered a carport where they fought with no onlookers; Garcia used a sharp tool against defendant; defendant retreated to the street where he found a wooden axe handle; and defendant was scared and believed Garcia was high.

We set out the relevant portions of defendant's cross-examination, italicizing the questions defendant views as improper:  The prosecutor asked defendant *if it was "just a coincidence" that the crowd stopped following him and Garcia as they entered the carport*.  The court overruled defendant's objection that the question called for speculation, but the prosecutor rephrased the question anyway:  "So this group of people that are following you, *they stop for no reason* and you go into this carport area and there is no one else there?"  Defendant agreed.  The prosecutor asked defendant about the axe handle he found after retreating from the carport:  "It's just on the ground on the sidewalk?"  Defendant said it was.  The prosecutor asked, "*Just randomly when you needed it?*"  After the court sustained an argumentative objection, the prosecutor probed what happened when defendant found the axe handle.  Defendant said he attempted to run away, but he "didn't literally run" and was "walking backwards" toward the park.

10

Garcia was facing him but turned "to take the hit" when defendant struck him on the head. Garcia was also "initially" facing defendant and "moved to take the hit" when defendant struck Garcia on his back.

The prosecutor asked, "Then [Garcia] is walking away from you right and you follow him[] [¶…¶] … on 3rd going toward[] Julian[?]" Defendant explained, "I followed him, but he didn't walk away," and "I was being followed. I followed him from 3rd up to Julian toward[] 4th." The prosecutor asked, "You were not afraid when you were following him, were you?" Defendant said he was, and the prosecutor asked, "Why would you follow someone that you are afraid of?" Defendant said, "I didn't know if he was going to get another weapon or anything of that nature or repercussions or anything." The prosecutor then commented, "*That doesn't make sense to me*," and asked "[Y]ou're on 3rd walking toward[] Julian, and Mr. Garcia's back is toward[] you. You are walking behind him?" Defendant said, "We were on Julian and 3rd, we were right on the corner; so there is no coming back up to Julian."

After eliciting that Garcia was biking away from defendant, the prosecutor asked "And you decide to get a gun?" Defendant said yes. The prosecutor asked defendant *how the person who gave him the gun knew he was on 3rd and Julian*? The court sustained an objection to the question as calling for speculation. After asking about defendant's relationship to Demo and Demo's timing, the prosecutor asked, "*He knew that you needed a gun at that point?*" The court sustained an objection. The prosecutor asked, "*How would he [Demo] know?*" and the court sustained another objection. Defendant said he had not seen Demo earlier that day, to which the prosecutor posed, "*But he was able to know that you were at 3rd and Julian right when you needed a gun he was there?*" The court sustained defendant's objections on grounds that the question was argumentative and called for speculation. The prosecutor asked, "He was able to give you a gun at 3rd and Julian; right?" Defendant agreed. He testified that Demo was a passenger in the car, and he did not know the driver. The prosecutor asked, "*Demo*

11

*knew you were at 3rd and Julian*, he was in the passenger seat, and he was able to hand you a gun*?*" Defendant objected, and the prosecutor was instructed to rephrase the question.

The prosecutor asked defendant about the handoff, defendant's prior convictions, and how he pursued Garcia with the gun. Defendant explained that he followed Garcia from 3rd and Julian to the parking lot with a gun "out of fear" and because he was "afraid of what [Garcia] is going to do." The prosecutor asked, "Instead of running away [in] the opposite direction, you follow him?" Defendant said he did. The prosecutor pressed, "You followed him with a gun?" Defendant said he did, and the prosecutor asked, "*How does that make sense?*" The court sustained an argumentative objection, and the prosecutor asked defendant about the shooting.

The prosecutor later inquired about defendant's state of mind. The prosecutor asked whether defendant accidently gave Kaiser the wrong name and social security number; whether he accidently decided to drive to San Francisco to dispose of the gun; and whether it was his decision to go to Las Vegas and shave his head. The prosecutor asked, "*Are you saying right now, as you sit here, when you were talking to your lawyer, that you accidentally shot Mr. Garcia?*" Counsel objected, and the prosecutor rephrased the question, asking "Are you trying to tell us that you accidentally shot Mr. Garcia?" Defendant said no, and he "wasn't thinking." Defendant denied planning to meet Demo on 3rd and Julian, but he agreed he "chased after Mr. Garcia when his back was toward[] [him]," and shot him five times.

Defendant argues that the prosecutor's question—"*Are you saying right now, as you sit here, when you were talking to your lawyer, that you accidentally shot Mr. Garcia?*"—was an improper comment on defendant's post-arrest silence. While we acknowledge some ambiguity, we understand the phrase "when you were talking to your lawyer" to refer to defendant testifying on direct examination, and not to defendant

12

"providing his story for the first time after obtaining counsel." Counsel was not deficient for not objecting to that question.

Defendant argues the quoted italicized questions were improper because they elicited information of which he had no personal knowledge. And the repeated questions about what Demo knew when he arrived with the gun were argumentative and conveyed to the jury that the prosecutor did not believe defendant was credible. We agree the questions, as phrased, called for speculation and were argumentative. But multiple objections were sustained on those grounds, and we see no deficient performance by counsel for not objecting further or seeking an admonishment. Counsel's objections alerted the jury to the speculative and argumentative nature of the prosecutor's questions. Not seeking an admonishment may have been a tactical decision not to draw further attention to what was clearly a problematic aspect of defendant's case. Although "it is improper for a prosecutor to argue that he has superior knowledge of sources unavailable to the jury" (*People v. Williams* (1997) 16 Cal.4th 153, 257), that is not what occurred here.

Nor do we see a reasonably probability that an outcome more favorable to defendant would have resulted had counsel sought an admonishment regarding the prosecutor's questions. The evidence from percipient witnesses showed defendant beating Garcia and fatally shooting him as he held up his hands. An admonishment would not have changed the evidence or prevented the prosecutor from arguing at the close of the case that defendant's version of events was not credible.

## 2. Lack of Objection During Closing Argument

The jury was instructed with CALCRIM No. 570 on the heat of passion theory of voluntary manslaughter: "1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; [¶] [AND] [¶] 3. The provocation would have

13

caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

Trial counsel argued that defendant acted in self-defense. Turning to the elements of first degree murder, he then argued that the killing was not deliberate or premeditated. He explained that provocation can be used to distinguish between first and second degree murder and also in deciding whether the killing was manslaughter. He continued: "I'm discussing the rules of manslaughter because it's my job. I have to talk about this, and I want you guys to understand these rules. I don't agree that this is manslaughter. I think [defendant] was acting in self-defense, but I have to discuss this, and I want you to understand the rules governing manslaughter in addition to the rules governing self-defense."

Counsel argued defendant acted without motive and in self-defense after Garcia provoked a fight. Counsel urged the jurors to consider manslaughter if they did not believe defendant had acted in self-defense. He argued that heat of passion manslaughter "is upon sudden quarrel"; that "[c]learly, whatever happened began because of this fight"; and that "the fear of being stabbed, the fear of being called out to fight and then … sudden[ly] somebody pulls out an awl and tries to stab you, that could invoke a strong emotion in a person." He argued such provocation "would have caused a person of average disposition to act rashly and without due deliberation … from passion rather than judgment," and posited, "So you have to consider how would the average person feel being attacked with a weapon? Would that evoke an emotion? Would that be a strong emotion? Yes, it would." Counsel explained imperfect self-defense, and argued it would apply if defendant's beliefs about imminent danger or the immediate need to use deadly force would be unreasonable to the average person.

The prosecutor argued in rebuttal that defendant had lied, he did not act in self-defense, and no independent witness testified that Garcia had threatened him. Anticipating the trial court's instruction to the jury that, "If you decide that a witness

14

deliberately lied to you about something significant in the case, you should consider not believing anything that witness says" (CALCRIM No. 226), the prosecutor argued that the jury should reject everything defendant said, leaving "[n]o direct evidence of anything that relates to heat of passion, imperfect self-defense, [or] self-defense." He continued: "*And this is the standard. Would an average – would a reasonable person run after someone that had a screwdriver and shoot them down because they had an unreasonable fear of that person?* No. There's nothing that shows heat of passion, nothing." He argued that defendant's conduct after acquiring the gun demonstrated both a premeditated and deliberate killing, and that "[t]his isn't heat of passion. *It can't just evoke the defendant's emotions. It has to be a person of average disposition. Would a normal person have acted the way [defendant] did? No. That's not how the average person – person of average disposition would have acted.*"

Defendant argues the italicized comments prejudicially misstated the law. The legal standard for heat of passion provocation does not ask whether an average person would have been provoked into killing the victim: "Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing. The proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. ... [P]rovocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*People v. Beltran* (2013) 56 Cal.4th 935, 949.) Provocation focuses on whether the surrounding circumstances were sufficient to cause a reasonable person to act rashly. "How the killer responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion." (*People v. Najera* (2006) 138 Cal.App.4th 212, 223.)

15

The prosecutor misstated the law by referring to how an average or reasonable person would have acted in defendant's circumstances, instead of asking whether an ordinary person's reason and judgment would have been obscured in defendant's circumstances. Even assuming defense counsel had no tactical reason for not objecting to the misstatements, we see no prejudice on this record. The trial court instructed the jury correctly with CALCRIM No. 570 (voluntary manslaughter based on heat of passion). We presume the jury followed the court's accurate instructions rather than the prosecutor's misstatements (*People v. Sanchez* (2001) 26 Cal.4th 834, 852), and nothing in the record suggests otherwise.

The subjective component of heat of passion manslaughter requires that the defendant "acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment." (CALCRIM No. 570.) Defendant testified that after picking up the axe handle, "I kept saying I didn't want to fight, but the crowd was trying to egg it on on both sides." That statement alone demonstrates that defendant's reasoning and judgment were not obscured by Garcia's purported aggression. Consistent with defendant's testimony, trial counsel argued that defendant had acted in self-defense and not under heat of passion. Overwhelming evidence demonstrated that defendant killed with malice, and we see no reasonable probability that the jurors would have returned a verdict more favorable to defendant had the prosecutor's misstatements about voluntary manslaughter been corrected during argument.

## C.    CUMULATIVE PREJUDICE

We reject defendant's argument that there was cumulative prejudice rising to the level of a due process violation. "Lengthy criminal trials are rarely perfect, and this court will not reverse a judgment absent a clear showing of a miscarriage of justice." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) Defendant received due process and a fair trial. He was able to present his defense, and he was not prejudiced by either the prosecutor's

16

questions related to defendant's prior gun possession conviction, or by counsel's performance during cross-examination and closing argument.

## D.   THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH A PRIOR SERIOUS FELONY OR STRIKE CONVICTION

In a bifurcated proceeding, the trial court found true that defendant suffered a conviction in 2001 for active participation in a gang, and that it qualified as both the prior serious felony and prior strike alleged in the amended information.  Defendant argues the abstract of judgment used to prove the conviction is insufficient to establish the elements of the offense as described by the California Supreme Court in *People v. Rodriguez* (2012) 55 Cal.4th 1125.

Penal Code section 186.22, subdivision (a) (section 186.22(a)) makes it unlawful to "actively participate[] in any criminal street gang with knowledge that its members engage in, or have engaged in, a pattern of criminal gang activity, and [to] willfully promote[], further[], or assist[] in any felonious criminal conduct by members of that gang."  Under Penal Code section 1192.7, "any felony offense, which would also constitute a felony violation of [Penal Code] section 186.22," qualifies as a "serious felony," and in turn, a strike offense.  (Pen. Code, §§ 667, subds. (d)(1), (e), 1192.7, subd. (c)(28).)

In 2012, the Supreme Court held that section 186.22(a) is not violated when an active gang member commits a felony offense but acts alone.  (*People v. Rodriguez*, *supra*, 55 Cal.4th at p. 1139.)  In *People v. Strike* (2020) 45 Cal.App.5th 143, review denied June 10, 2020 (*Strike*), the appellate court held that the "change in the interpretation of section 186.22(a) rendered a pre-*Rodriguez* conviction inconclusive on its face as to whether it qualified as a strike."  (*Strike*, at p. 150.)  Strike pleaded guilty in 2007 to active gang participation under section 186.22(a).  He admitted the prior conviction in a 2017 prosecution, and the superior court found the admission extended to the elements of section 186.22 "as now understood," based on the allegations in the 2007

17

charging document that a codefendant was a member of defendant's gang. (*Strike*, at pp. 146–147.) Because the record did not show Strike admitted the factual allegations contained in the 2007 charging document as part of his guilty plea, the superior court in 2017 was found to have engaged in impermissible fact finding. (*Id*. at pp. 152–153.) The inquiry "invade[d] the jury's province by permitting the court to make disputed findings about 'what a trial showed, or a plea proceeding revealed, about the defendant's underlying conduct.' " (*Id*. at p. 152; *People v. Gallardo* (2017) 4 Cal.5th 120, 124 ["when the criminal law imposes added punishment based on findings about the facts underlying a defendant's prior conviction, '[t]he Sixth Amendment contemplates that a jury—not a sentencing court—will find such facts, unanimously and beyond a reasonable doubt' "].) The matter was remanded for a new hearing on the prior strike for the prosecution to demonstrate, based on the record of the 2007 proceeding, that the defendant's guilty plea encompassed a relevant admission in light of *Rodriguez*'s clarification that the defendant must have committed the offense with at least one other gang member. (*Strike*, at p. 154.)

The Attorney General invites us to conclude that *Strike* was wrongly decided. We are not persuaded here to depart from the conclusion in *Strike* and *People v. Gallardo* that Sixth Amendment principles limit the trial court's role " 'to determining the facts that were necessarily found in the course of entering the conviction.' " (*Strike*, *supra*, 45 Cal.App.5th at p. 152.)

The Attorney General also argues "[a]ny violation of section 186.22, subdivision (a), is a strike offense," the record establishes that defendant suffered a conviction under section 188.22, and defendant must attack his prior conviction in a collateral proceeding where he would have the burden of proving the conviction is invalid. But defendant is not challenging the *validity* of his prior conviction, only whether it has been shown to qualify as a serious felony under Penal Code section 1192.7 (and in turn as a strike). Under that section, the conviction must satisfy the current (i.e.,

post-*Rodriguez*) understanding of the offense.  We agree the record establishes defendant's 2001 conviction for gang participation, but the abstract of judgment alone does not prove that the conviction constitutes a violation of section 186.22(a) as interpreted in *Rodriguez*.  (*Strike*, *supra*, 45 Cal.App.5th at p. 150.)  "The prosecution had to prove defendant admitted all of the elements of the offense as explained by *Rodriguez*, including that he committed a felony offense with another member of his gang."  (*Ibid*.)  We will accordingly reverse the true findings regarding the serious felony and strike allegations, and remand the matter for retrial of the prior conviction allegations and resentencing.  (*Id.* at p. 155.)

## III.  DISPOSITION

The true findings regarding the prior serious felony and strike allegations are reversed.  The judgment is vacated, and the matter is remanded to retry the prior serious felony and prior strike allegations and for resentencing.

_____

Grover, J.


**WE CONCUR:**


_____

Greenwood, P. J.


_____

Elia, J.


**H046446 –** *The People v Moore*